# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: INSULIN PRICING LITIGATION | Case No. 2:23-md-03080 (BRM)(RLS) MDL No. 3080 |
| MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION, | JUDGE BRIAN R. MARTINOTTI JUDGE RUKHSANAH L. SINGH |
| *Plaintiff*, | DIRECT-FILED COMPLAINT PURSUANT TO CASE MANAGEMENT ORDER NO. 9 |
| v. | |
| ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (formerly EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; EXPRESS SCRIPTS PHARMACY, INC.; MEDCO HEALTH SOLUTIONS, INC.; THE CIGNA GROUP; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, L.L.C.; CAREMARKPCS HEALTH, L.L.C.; CAREMARK, L.L.C.; UNITEDHEALTH GROUP, INC.; OPTUM, INC.; OPTUMRX INC.; ZINC HEALTH SERVICES, LLC; ASCENT HEALTH SERVICES LLC; EMISAR PHARMA SERVICES LLC., | Civil Action No. 2:25-cv-389 |
| | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................2

II.    PARTIES..............................................................................22

    A.    Plaintiff Maryland-National Capital Park and Planning Commission ..................................................................22

    B.    Manufacturer Defendants.................................................24

        1.    Eli Lilly ..................................................................24

        2.    Sanofi-Aventis ......................................................25

        3.    Novo Nordisk ........................................................26

    C.    PBM Defendants................................................................28

        1.    CVS Caremark and Zinc Health Services, LLC ...................28

        2.    Express Scripts and Ascent Health Services LLC ................34

        3.    OptumRx and Emisar Pharma Services LLC ......................39

III.    JURISDICTION AND VENUE.................................................44

IV.    FACTUAL ALLEGATIONS....................................................47

    A.    Life-Saving Insulin Is Not a New Drug..........................47

        1.    Diabetes Requires Insulin. ...................................47

        2.    Discovery and History of Insulin .........................50

        3.    The Unavailability of Generic Insulin. ................54

    B.    The Insulin Market Is Enormous.....................................55

    C.    The Pharmaceutical Supply and Payment Chains...........57

        1.    The Rise of PBMs in the Pharmaceutical Supply Chain .....................................................61

2.    The Current Size and Role of PBMs in the
      Pharmaceutical Supply Chain ...............................................63

3.    The Close Relationship Between the PBM
      Defendants and Manufacturer Defendants ...........................68

D.    The Insulin Pricing Scheme ............................................................72

      1.    Insulin's Price Has Risen Dramatically. ..............................73

      2.    Insulin List Prices Have Increased in Lockstep. ..................76

      3.    The Growing Gap Between List Prices and Net
            Prices .......................................................................................80

      4.    Rebates Gone Awry ................................................................85

      5.    Clawbacks ...............................................................................93

      6.    Spread Pricing.........................................................................94

      7.    Defendants' Admissions ........................................................96

E.    The Insulin Pricing Scheme Reflects the PBM
      Defendants' Self-Dealing.............................................................107

      1.    Relabeling of "Rebates"......................................................109

      2.    Rebate Aggregators...............................................................114

      3.    Illusory Audit Provisions ....................................................125

F.    Insulin Adjuncts: Type 2 Medications...........................................126

G.    The Maryland-National Capital Park and Planning
      Commission Purchased At-Issue Drugs Directly from
      Defendant CVS Caremark...............................................................132

H.    The Insulin Pricing Scheme Has Injured Maryland-
      National Capital Park and Planning Commission..........................136

V.    TOLLING OF THE STATUTES OF LIMITATIONS............................139

      A.    Accrual Rule....................................................................................139

B.    Discovery Rule .............................................................141

C.    Fraudulent Concealment ...............................................142

D.    Equitable Estoppel & Equitable Tolling.......................143

VI.    CLAIMS FOR RELIEF .......................................................144

COUNT ONE — VIOLATIONS OF THE RACKETEER
        INFLUENCED AND CORRUPT ORGANIZATIONS
        ACT ("RICO") 18 U.S.C. § 1962(C) .............................144

A.    Defendants Are Culpable "Persons" Under RICO........................145

B.    The Manufacturer–PBM RICO Enterprises ..................................145

C.    The Enterprises Misrepresent and Fail to Disclose
        Material Facts in Furtherance of the Insulin Pricing
        Scheme. .......................................................................151

D.    Defendants' Use of the U.S. Mail and Interstate Wire
        Facilities. ....................................................................155

E.    Conduct of the Manufacturer–PBM Enterprises' Affairs. .............158

F.    Defendants' Pattern of Racketeering Activity ..............................161

G.    The RICO Defendants' Motive ....................................................162

H.    The Manufacturer–PBM Enterprises' Insulin Pricing
        Scheme Injured the Maryland-National Capital Park and
        Planning Commission. ................................................163

COUNT TWO — VIOLATIONS OF RICO, 18 U.S.C. §
        1962(D)  BY CONSPIRING TO VIOLATE 18 U.S.C. §
        1962(C).......................................................................165

COUNT THREE — CIVIL CONSPIRACY ...........................................168

COUNT FOUR — COMMON LAW FRAUD ......................................171

COUNT FIVE — UNJUST ENRICHMENT.........................................176

COUNT SIX — MARYLAND CONSUMER PROTECTION
ACT, MARYLAND COMMERCIAL LAW CODE
SECTION 13-301 *ET SEQ.*..........................................................178

I.    PRAYER FOR RELIEF........................................................182

II.   JURY DEMAND................................................................184

Pursuant to this Court's Case Management Order No. 9, the "Designated Forum"—the federal district court in which Plaintiff would have filed its case in the absence of direct filing—is the United States District Court for the District of Maryland. Plaintiff Maryland-National Capital Park and Planning Commission ("M-NCPPC" or "the Park and Planning Commission" or "Plaintiff"), by and through its undersigned attorneys, brings this action against Defendants Novo Nordisk Inc. ("Novo Nordisk"); Eli Lilly and Company ("Eli Lilly"); Sanofi-Aventis U.S. LLC ("Sanofi"); CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; Caremark Rx, Inc.; Zinc Health Services, LLC, (together with CVS Health Corporation, CVS Pharmacy Inc., CaremarkPCS Health, L.L.C., Caremark Rx, L.L.C., and CaremarkRx, Inc., "CVS Caremark"); Express Scripts, Inc.; Express Scripts Administrators, LLC; Express Scripts Pharmacy, Inc.; Evernorth Health, Inc. (formerly Express Scripts Holding Company); Medco Health Solutions, Inc.; The Cigna Group; Ascent Health Services LLC, (together with Express Scripts, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Evernorth Health, Inc., Medco Health Solutions, Inc., and The Cigna Group, "Express Scripts"); UnitedHealth Group, Inc.; Optum, Inc.; OptumRx, Inc.; Emisar Pharma Services LLC, (together with UnitedHealth Group, Inc.; Optum, Inc.; and OptumRx, Inc., "OptumRx"), and allege as set forth below.

## I.    INTRODUCTION

1.    The three largest pharmacy benefit managers in the United States—CVS Health, Express Scripts, and OptumRx (the "PBM Defendants"[1])—engage in unfair and deceptive conduct designed to artificially inflate the list price of insulin and other diabetes medications and extract ever-larger portions of rebates and other payments from the three largest insulin manufacturers—Eli Lilly, Novo Nordisk, and Sanofi (the "Manufacturers" or the "Manufacturer Defendants"). The Manufacturer Defendants, seeking to secure preferential or exclusionary placement on the PBM Defendants' drug formularies, have paid the PBM Defendants ever-increasing rebates, fees, and kickbacks and have inflated the list prices of rapid- and long-acting analog insulins, human insulin drugs, and other diabetes medications to fund these rebates, fees, and kickbacks.

2.    The PBM Defendants and Manufacturer Defendants conspired to prevent disclosure of this scheme by obscuring the true price of insulin, the amount and nature of rebates and fees paid by the Manufacturer Defendants to the PBM

---

[1] Between 2019 and 2021, each PBM Defendant created a rebate aggregator (also called a "group purchasing organization" or "GPO") to negotiate and enter into rebate contracts with the Manufacturer Defendants on behalf of the PBM Defendants. These Rebate Aggregator Defendants—Ascent Health Services LLC; Zinc Health Services, LLC; and Emisar Pharma Services LLC—perform much of the same contracting functions that the PBM Defendants previously handled themselves. Hereinafter, references to actions by the "PBM Defendants" include actions taken by the Rebate Aggregator Defendants on behalf of the PBM Defendants.

Defendants in exchange for preferred formulary placement, and the fraction of rebates passed through to clients and health plan payors. This misconduct, and the misconduct described below, is referred to herein as the Insulin Pricing Scheme.

3.      Defendants' Insulin Pricing Scheme directly and foreseeably causes payors like M-NCPPC to overpay for these life-saving medications. Thus, this action is brought to redress Plaintiff's injuries flowing from Defendants' Insulin Pricing Scheme—which has driven up the price of insulin to the substantial benefit of PBMs and insulin manufacturers—and to obtain prospective injunctive relief to curtail Defendants' practices, provide greater transparency in insulin pricing, and lower the price health plans and consumers pay for insulin going forward.

4.      Over the past twenty years, the prices paid by consumers and health plan payors, like M-NCPPC, for diabetes medications have skyrocketed—the prices of some diabetes medications have risen more than tenfold.[2] In contrast, the average cost of consumer goods and services has merely doubled during the same time period. The surging costs of diabetes medications are not due to competitive market forces or climbing expenditures on goods, production, or research and development. Defendants have engineered these escalating prices to exponentially

_____

[2] Brenna Miller, *After Decades of Profiteering, Insulin Manufacturer Finally Cuts the Price*, Lown Inst. (Mar. 2, 2023), https://lowninstitute.org/after-decades-of-profiteering-insulin-manufacturer-finally-cuts-the-price/#:~:text=Just%20twenty%20years%20later%2C%20the,rationing%20or%20foregoing%20their%20medication.

increase their profits at the expense of payors and their plan beneficiaries.

5.      Diabetes is an epidemic in the United States. In total, nearly forty million people, or 11.6% of the country, live with diabetes.[3] Of this number, approximately six million people rely on daily insulin treatments to survive. In addition to natural or synthetic human insulin, several analogs of human insulin have been developed since the mid-1990s. These insulin analogs act more rapidly and for a longer period of time than earlier developed drugs, making them potentially more convenient or effective for patients.

6.      Interruptions to or interference with insulin therapy (e.g., cutting back insulin use due to cost) lead to severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States.[4] Missed or inadequate insulin therapy can leave people with diabetes with too little insulin in their system, triggering hyperglycemia (hyperosmolar hyperglycemic state or "HHS") followed by diabetic ketoacidosis ("DKA"). Left

---

[3] Am. Diabetes Assoc., *Statistics About Diabetes,* Diabetes.org, https://diabetes.org/about-diabetes/statistics/about-diabetes (last visited Dec. 27, 2024).

[4] *Diabetes Basics*, Ctrs. for Disease Control & Prevention (May 15, 2024), https://www.cdc.gov/diabetes/about/?CDC_AAref_Val=https://www.cdc.gov/diabetes/basics/diabetes.html.

untreated, DKA can lead to loss of consciousness and death within days.[5] DKA is responsible for more than 500,000 hospital days per year in the United States, and the annual hospital cost for patients with DKA is approximately $2.4 billion.[6] The medical expenses for individuals with diabetes are approximately 2.6 times higher than those for individuals without diabetes.[7] According to the Centers for Disease Control and Prevention, the total annual cost of diabetes in the U.S. is $413 billion, with $307 billion spent each year on direct medical costs and $106 billion lost each year due to reduced productivity.[8]

7.    The amount consumers and health plan payors spend on these medications is in addition to the hundreds of dollars people living with diabetes must spend every year on diabetes management supplies (e.g., test strips and glucose meters used to read blood sugar levels and syringes, pen needles, infusion sets, and/or pods needed to administer insulin). In short, living with diabetes now

---

[5] *Diabetic Ketoacidosis*, Diseases & Conditions, Mayo Clinic http://www.mayoclinic.org/diseases-conditions/diabetic-ketoacidosis/basics/definition/con-20026470 (last visited Dec. 27, 2024).

[6] Abbas E. Kitabchi et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, Diabetes Care 32(7), 1335–1343 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2699725/.

[7] The Burden of Diabetes in Maryland, Am. Diabetes Assoc. (Mar. 2024), https://diabetes.org/sites/default/files/2024-03/adv_2024_state_fact_Maryland.pdf.

[8] *Health and Economic Benefits of Diabetes Interventions*, Ctrs. for Disease Control & Prevention (May 15, 2024), https://www.cdc.gov/nccdphp/priorities/diabetes-interventions.html?CDC_AAref_Val=https://www.cdc.gov/chronicdisease/programs-impact/pop/diabetes.htm.

costs more than $1,000 per month per patient, resulting in significant costs to individuals and payors like Plaintiff, who cover some or all costs of such care.[9]

8.    In 2017 alone, diabetes cost an estimated $4.9 billion in direct medical expenses in the State of Maryland.[10] That same year, an additional $2.1 billion was spent on indirect costs from lost productivity due to diabetes.[11] Approximately 537,000 Marylanders—or 11.1% of the adult population—have diabetes.[12] That percentage is even greater if one includes in the calculation the estimated 139,000 Marylanders who have diabetes and do not know it yet.[13] Over one third of Maryland's adult population has prediabetes.[14] Each year, approximately 36,000 Marylanders will be diagnosed with diabetes.[15]

---

[9] *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, U.S. S. Fin. Comm., https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf (last visited Dec. 27, 2024).

[10] *The Burden of Diabetes in Maryland*, Am. Diabetes Assoc., https://diabetes.org/sites/default/files/2024-03/adv_2024_state_fact_maryland.pdf (last visited Jan. 13, 2025).

[11] *Id.*

[12] *Id.*

[13] *The Burden of Diabetes in Maryland*, Am. Diabetes Assoc., https://diabetes.org/sites/default/files/2024-08/ADV_2022_State_Fact_sheets_all_rev_MD-4-4-22.pdf (last visited Jan. 13, 2025).

[14] *Id.*

[15] *Id.*

9.    Plaintiff M-NCPPC spent substantial amounts of money on the at-issue insulin drugs during the relevant time period.[16]

10.    Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulins, analog insulins, and other medications used to treat diabetes. In 2020, as in years past, the three Manufacturer Defendants controlled 92% (by volume) and 96% (by revenue) of the global market for diabetes drugs.[17]

11.    Between 2004 and 2022, each Manufacturer Defendant raised the list prices of their respective at-issue drugs in an astounding and inexplicable manner. For example, between 2004 and 2006, four of the main analog insulins—Levemir, Novolog, Lantus, and Humalog—cost consumers between $50 and $75 per prescription.[18] In 2022, the cost per prescription for those drugs was between $275 and $308. Between 2004 and 2022, Eli Lilly, Novo Nordisk, and Sanofi raised their list prices for analog insulins by more than 150%.[19]

---

[16] The at-issue drugs are listed in a chart at the beginning of the Factual Allegations.

[17] William Herman & Shihchen Kuo, *100 years of insulin: Why is insulin so expensive and what can be done to control its cost*, Endocrinol Metab. Clin. North Am., (Sept. 2021), at e21.

[18] *See infra* ¶ 12.

[19] *Id.*

12.     Eli Lilly, Novo Nordisk, and Sanofi's analog insulin price increases have been both rapid and in lockstep for years, as shown below:[20]



**Comparison of Analog Insulin Price Increases—Lantus, Humalog, Novolog, and Levemir, 2004–2022**



Manufacturer price for 1000 IU insulin vial, sorted by year

Source: GlobalData Price Intelligence Database

13.     These rapid and lockstep price increases are seen across all at-issue drugs.

14.     The skyrocketing cost of insulin cannot be explained away by the drug companies' typical rationalizations for high prices. Indeed, the manufacturers

---

[20] William Newton, *Insulin pricing: could an e-commerce approach cut costs?*, Pharm. Tech. (Mar. 31, 2022), https://www.pharmaceutical-technology.com/features/insulin-pricing-could-an-e-commerce-approach-cut-costs/; *see also* Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2015), https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep.

admit that their price hikes are unrelated to any increase in production or research and development costs. Instead, the inflated list prices result from the Insulin Pricing Scheme.

15. In furtherance of this scheme, the Manufacturer Defendants effectively set two different prices for the at-issue drugs: a publicly-available "list" price, which serves as the basis for what health plans and consumers pay for insulin, and an undisclosed, lower "net" price that reflects what Manufacturer Defendants actually receive after accounting for their rebates and other kickbacks to the PBM Defendants. The gap between the "list" price and the "net" price of these medications has increased significantly in the last twenty years.[21] This widening gap means that health plan payors, like M-NCPPC, pay ever-increasing amounts for the at-issue drugs.

16. Defendants CVS Caremark, Express Scripts, and OptumRx are pharmacy benefit managers that, together with the Manufacturer Defendants, dictate the availability and price of the at-issue drugs for most of the U.S. market. The PBM Defendants serve as both middlemen and gatekeepers between drug manufacturers on one side, and health insurers, payors, and patients on the other.

---

[21] *See, e.g.*, Adam Fein, *Five Top Drugmakers Reveal List vs. Net Price Gaps (Plus: The Trouble With Insulin Prices)*, Drug Channels (Aug. 11, 2020), https://www.drugchannels.net/2020/08/five-top-drugmakers-reveal-list-vs-net.html.

The PBM Defendants control nearly 80% of the PBM market; additionally, they own three of the largest pharmacies in the United States (three of the top five dispensing pharmacies) and are housed within the same corporate families as three of the largest insurance companies in the United States—Aetna (CVS Health), Cigna (Express Scripts), and UnitedHealthcare (OptumRx). Together, the PBM Defendants report more than $300 billion a year in revenue.

17.    Indeed, for transactions where the PBM Defendants also control the insurer and the pharmacy (e.g., Aetna–Caremark–CVS Pharmacy), these middlemen capture as much as half of the money spent on each insulin prescription, even though they contribute nothing to the development, manufacture, or innovation of the drugs.[22]

18.    The PBM Defendants establish national formulary offerings, which are lists of medications covered by health plans that influence which drugs patients use and determine out-of-pocket costs. The PBM Defendants develop and control these formularies, and are therefore able to extract rebates, fees, and discounts from the Manufacturer Defendants in exchange for favorable or exclusive formulary placement.

---

[22] Testimony of Karen Van Nuys before the U.S. S. Fin. Comm. 4 (Mar. 30, 2023), https://www.finance.senate.gov/imo/media/doc/Van%20Nuys%20Senate%20Finance%20Committee%20Statement%2003.27.23.pdf.

19.     Formularies also include a ranked list of drugs, with each drug placed into a "tier" dictating the cost and resulting accessibility to consumers. Health plans rely on these formularies to determine what proportion of their members' drug costs they will cover; for higher formulary tiers, plan members will pay the highest copayment. Drugs in lower, "preferred" formulary tiers are supposed to be cheaper for plan members.[23]

| Drug tier | Type of drugs included | Your cost |
|---|---|---|
| Tier 1 | Most generic drugs | Lowest copay |
| Tier 2 | Most common brand name drugs<br>Preferred brand name drugs<br>Some high-cost generic drugs | Medium copay |
| Tier 3 | Non-preferred brand name drugs | Highest copay |
| Tier 4<br>(Specialty Tier) | Unique or very high-cost drugs | Percentage of total drug cost, called "coinsurance" |

20.     Where two medicines are largely interchangeable, a pharmacy benefit manager will sometimes exclude the more expensive of the two from its formulary—again purportedly based on the price of the drug for patients. When a drug is excluded from or disfavored in the formulary, health insurers using that formulary will either not cover any portion of the cost of the drug or require their members to pay a larger coinsurance amount. As a result, exclusionary formularies

---

[23] *See What is a tiered formulary and what does it mean for me?*, UnitedHealthcare, https://www.uhc.com/news-articles/medicare-articles/what-is-a-tiered-formulary-and-what-does-it-mean-for-me (last visited Dec. 27, 2024).

enable pharmacy benefit managers, including the PBM Defendants here, to push patients toward certain brands of drugs over others. This power gives pharmacy benefit managers enormous control over drug purchasing behavior as well as leverage over drug manufacturers.

21.     While the PBM Defendants could use their considerable market power to drive down drug prices by forcing drug manufacturers to compete on price for formulary placement, instead, they and the Manufacturer Defendants figured out a way to game the system for their mutual benefit. To gain formulary access, the Manufacturer Defendants raise their published list prices and then "rebate" a significant portion of the list price to the PBM Defendants. The rebates[24] are provided under a variety of labels—discounts, credits, concession fees, etc. But however they are described, they are a quid pro quo for formulary inclusion or placement.[25]

22.     The result of this rebate scheme is a significant difference between the list price set by the Manufacturer Defendants, and the net price realized by the

---

[24] In the context of this Complaint, "rebates" should be understood to include all payments, fees, or financial benefits of any kind conferred by the Manufacturer Defendants to the pharmacy benefit managers, either directly via contract or indirectly via Manufacturer or pharmacy benefit manager-controlled intermediaries. But the actual "Manufacturer Payments" are distinct from and much larger than "Payor Rebates," which in some cases are required by contract to be provided to health plans by their respective pharmacy benefit managers.

[25] *See*, *e.g.*, Linda Cahn, *Don't Get Trapped By PBMs' Rebate Labeling Games*, 18 Managed Care 31 (2009).

manufacturers once all rebates paid to the PBM Defendants are taken into account. The PBM Defendants may pass a portion of the rebates on to their insurer clients (some of which are owned by or affiliated with them) and pocket the rest. The greater the rebate, the more the PBM Defendants pocket. Although the true rebate amounts are unknown, the difference between the list price and the net price suggests that the rebates may be as great as, or even greater than, 50% of the list price.

23.    While the PBM Defendants' contracts imply that such rebates benefit consumers and health plan payors such as Plaintiff, in reality, the rebates that the PBM Defendants pass along ("Payor Rebates") are a fraction of the rebates and other fees the PBM Defendants actually receive from the manufacturers ("Manufacturer Payments"). The total amount and nature of the Manufacturer Payments, the amount the PBM Defendants pocket, and the amount the PBM Defendants pass through to clients/payors are all carefully guarded secrets. The true nature of the scheme is thus concealed from patients and health plan payors, such as Plaintiff.

24.    This rebate scheme creates a "best of both worlds" scenario for the Defendants. The PBM Defendants obtain ever-larger rebates in exchange for granting access to the exclusionary formularies, increasing their take, and the Manufacturer Defendants increase their list prices so they can pay the rebates to

Complaint- 13

the PBM Defendants without cutting into their profit margins. In effect, the quid pro quo arrangement between the PBM Defendants and Manufacturer Defendants creates a price war in reverse. The Manufacturer Defendants keep raising their list prices, so that they can pay larger and larger "rebates" to the PBM Defendants. One astute commentator refers to this as "bubblenomics."[26] The "gross-to-net bubble"—that is, the gap between sales based on the list prices and sales based on the net prices of drugs—was $204 billion in 2021 for patent-protected brand-name drugs.[27]

25.     The result of the scheme is an ever-widening gap between the publicly available manufacturer list price, which determines what consumers and health plans pay, and the net realized price actually received by Manufacturer Defendants. The following chart shows this gap for Lantus, Sanofi's top-selling analog insulin.[28]

---

[26] Adam J. Fein, *Novo Nordisk Sheds New Light on PBM Rebates, the Gross-to-Net Bubble, and Warped Channel Incentives*, Drug Channels (Dec. 6, 2016), http://www.drugchannels.net/2016/12/novo-nordisk-sheds-new-light-on-pbm.html.
[27] Adam J. Fein, *Warped Incentives Update: The Gross-to-Net Bubble Exceeded $200 Billion in 2021*, Drug Channels (Mar. 22, 2022), https://www.drugchannels.net/2022/03/warped-incentives-update-gross-to-net.html.
[28] Denise Roland & Peter Loftus, *Insulin Prices Soar While Drugmakers' Share Stays Flat,* Wall St. J. (Oct. 7, 2016), https://www.wsj.com/articles/insulin-prices-soar-while-drugmakers-share-stays-flat-1475876764.





26.    And in more recent years, the gap has continued to widen, as confirmed by Eli Lilly and Sanofi's own reports:[29]

---

[29] Eli Lilly and Co., *Twenty Nineteen Eli Lilly and Company Integrated Summary Report*, https://assets.ctfassets.net/srys4ukjcerm/4OhD66szgxpdHhhCqzE2Ev/983bd8407c49928f309936e1161bec47/Lilly-2019-Integrated-Summary-Report.pdf#page=23 (last visited Dec. 27, 2024);
Sanofi, *Sanofi: 2023 Pricing Principles Report*, https://www.sanofi.com/assets/dotcom/pages/docs/investor-relations/environmental-social-governance/Sanofi-2023-Pricing-Principles-Report.pdf (last visited Dec. 27, 2024).

**Comparison of List and Net Price of Humalog (Eli Lilly), 2015–2019**





## Humalog List and Net Price Per Vial[4]

The last list price increase for Humalog vial was May 2017. The net price in the chart represents the revenue Lilly realized per Humalog and Insulin Lispro vial after rebates and discounts. Increases in list prices do not always create increases in net prices.

**Comparison of List and Net Price of Sanofi Insulin, 2012–2022**



27.    The PBM Defendants tout their market power to drive down drug prices. They boast about the "rebates" or "discounts" they bargain with drug manufacturers. The story they tell is that these rebates and discounts are obtained

for the benefit of patients since they purportedly result in lower costs for prescription drugs. For example, Cigna, which owns Express Scripts Holding, claims, "[w]e consult with our clients on how best to structure and leverage the pharmacy benefit to meet plan objectives for affordable access to the prescription medications customers need to stay healthy and to ensure the safe and effective use of those medications."[30]

28.    CVS Health Corp. contends it "assists its PBM clients in designing pharmacy benefit plans that help improve health outcomes while minimizing the costs to the client."[31]

29.    OptumRx claims that its PBM businesses "improve overall health system performance by optimizing health care quality and delivery, reducing costs and improving patient, consumer and provider experience, leveraging distinctive capabilities in data and analytics, pharmacy care services, health care operations, population health and health financial services."[32]

30.    But the story the PBM Defendants tell is far from the whole truth. While it is true that they obtain rebates and discounts, they neglect to reveal the large portion of these payments that they pocket. They also neglect to reveal that their formulary decisions are based on the amount of the rebates paid by drug

---

[30] The Cigna Group, Annual Report (Form 10-K) (Feb. 23, 2023) at 5.
[31] CVS Health Corp., Annual Report (Form 10-K) (Feb. 8, 2023) at 9.
[32] UnitedHealth Group, Annual Report (Form 10-K) (Feb. 24, 2023) at 1.

manufacturers, including the Manufacturer Defendants, even if other, lower-priced alternatives exist. And they neglect to reveal that the consequence of this scheme is higher drug costs for payors like M-NCPPC, whose payments (like the payments of their health plan beneficiaries) are calculated based on the list price (i.e., average wholesale price), not the lower "net" price actually received by the Manufacturer Defendants once all rebates and other payments to PBM Defendants are taken into account. Indeed, the PBM Defendants misrepresent the role they play in the supply chain, and their impact on the prices actually paid by health plan payors for drugs.

31.    The PBM Defendants are avaricious middlemen, with a stranglehold on the prescription drug supply chain. Their scheme to sell formulary access for rebates drives up the cost of prescription drugs for the people who need to use them to stay alive. This scheme serves one simple purpose for the PBM Defendants—to make more money.

32.    The Manufacturer Defendants are equally at fault. Their conduct deprives patients of a fair price—a price that would result from the operation of normal market forces. Through the scheme, they maintain the ability to sell the at-issue medications to the millions of Americans who depend on them, without having to lower the "real" net prices to gain market share. They bargain for market share by providing ever-larger rebates to the PBM Defendants and entering into exclusive relationships with those PBM Defendants, inflating the prices paid by

consumers and health plan payors in order to preserve their net realized price and to ensure that they maximize the number of individuals and payors like M-NCPPC who continue purchasing the insulin they manufacture. The Manufacturer Defendants' refusal to disclose their net realized prices for insulins and the web of confidentiality agreements they have created and/or participated in with PBM Defendants have been critical to the furtherance of the Insulin Pricing Scheme.

33.     Recognizing the growing discrepancy between published list prices and net prices, a New York Times op-ed called for transparency in setting prices:

> In the meantime, we need a fair and transparent system for setting prices. In much of Europe, insulin costs about a sixth of what it does here. That's because the governments play the role of pharmacy benefit managers. They negotiate with the manufacturer directly and have been very effective at driving down prices. In the United States, we rely on the private sector and a free market for drug pricing. But in order for this to work, we need to regulate it better and demand greater transparency.[33]

34.     The physical, emotional, and financial toll of the excessive prices for the at-issue medications are devastating. Many patients cannot afford their medications and suffer dire consequences as a result. Others resort to under-dosing their insulin, injecting expired insulin, and starving themselves to control their blood sugars with as little insulin as possible. These behaviors are dangerous for

---

[33] Kasia Lipska, *Break Up the Insulin Racket*, N.Y. Times (Feb. 20, 2016), https://www.nytimes.com/2016/02/21/opinion/sunday/break-up-the-insulin-racket.html.

people living with diabetes. Because such behaviors inadequately control these individuals' blood sugar levels, they can lead to serious complications such as kidney failure, heart disease, blindness, infection, and amputations. In some cases, patients are forced by exclusionary formulary tiering to use an insulin brand that is less effective in controlling their individual blood sugars, or to which they have some degree of allergic reaction—or to pay increased copayments to access the non-preferred brand of insulin they need.

35.    The cost of analog insulin—the most effective and favored type—has gone up so much that some prominent physicians have started encouraging patients to switch to human insulin despite its many disadvantages, thus undermining the U.S. standard of care in relation to international best medical practices for diabetes.[34]

36.    The Park and Planning Commission currently provides health benefits to over 5,400 beneficiaries, including employees, their dependents, and retirees, and makes direct payments to its PBM, Defendant CVS Caremark, on a regular basis to cover a portion of the cost of insulin for beneficiaries of the plan. Indeed, during the relevant time period, M-NCPPC paid Defendants substantial sums just to cover its portion of the cost of the at-issue insulin drugs for the beneficiaries of

---

[34] Irl B. Hirsch, MD, *Changing Cost of Insulin Therapy in the U.S.* (Mar. 6, 2016), https://web.archive.org/web/20201005020028/https://professional.diabetes.org/files/media/Changing_Cost_Insulin.pdf.

its self-funded insurance plan—costs that will continue in the future under the ongoing Insulin Pricing Scheme.

37.    Yet, even amid public scrutiny and government investigations, the full magnitude of the Insulin Pricing Scheme and its impact on pricing to patients and payors was never fully revealed. In particular, the Defendants conspired to conceal from payors, including M-NCPPC, the marked difference between the size of the Manufacturer Payments obtained by the PBM Defendants when compared to the rebates passed along to the Park and Planning Commission and other customers, the extent of the resulting pricing overcharges secured by the Manufacturer Defendants, and the vast sums that the PBM Defendants retained as kickbacks.

38.    This profound lack of transparency continues to this day. In March 2023, in the face of consumer litigation and mounting public and political pressure, Eli Lilly announced price concessions that were matched shortly thereafter by its competitors. While the price concessions are substantial, the announced price reduction of 70%, capping out of pocket costs at $35 per month, not only demonstrates the magnitude of overcharge previously enforced, it is a significant markup over the $6 per vial production cost, and does not apply to all insulin

products, nor to all insulin purchasers.[35] Indeed, some commentators have claimed that the coordinated price reductions might ultimately lead to even higher profits for manufacturers. In short, these recent concessions merely demonstrate the depth and magnitude of the Insulin Pricing Scheme; the full extent of which is still not fully, publicly known.

39.    This action seeks to hold the PBM Defendants and Manufacturer Defendants liable for their exploitation of the pharmaceutical supply chain for their financial benefit. There is simply no reason that prices for the at-issue medications—which cost just a fraction of the price that health plans and consumers pay to produce—have skyrocketed other than to increase the profits of the Defendants.

## II.    PARTIES

### A.    Plaintiff Maryland-National Capital Park and Planning Commission

40.    Plaintiff Maryland-National Capital Park and Planning Commission (M-NCPPC) was founded in 1927 and is a nationally recognized leader in land use planning, parks, and recreation.[36] M-NCPPC, a body corporate and bi-county

---

[35] Dzintars Gotham, Melissa J. Barber, & Andrew Hill, *Production Costs and Potential Prices for Biosimilars of Human Insulin and Insulin Analogues*, BMJ Glob. Health (Sept. 25, 2018), https://gh.bmj.com/content/bmjgh/3/5/e000850.full.pdf.

[36] *About Us*, M-NCPPC, https://www.mncppc.org/about/ (last visited Jan. 12, 2025)

agency chartered by the State of Maryland, works to improve the well-being of over two million residents within the Montgomery County and Prince George's County regions.[37]  M-NCPPC provides a comprehensive benefits package for its employees.[38]

41.    M-NCPPC brings this case for the benefit of the M-NCPPC employees, each of whom provide necessary services to the residents of the Montgomery County and Prince George's County regions and were injured as a result of the Insulin Pricing Scheme.

42.    Any increase in spending negatively impacts the ability of the M-NCPPC employees to provide necessary services to these communities.

43.    The Insulin Pricing Scheme has had such an impact.

44.    Additionally, M-NCPPC maintains self-insured health plans and provides health benefits to over 5,400 individuals, including employees, their dependents, and retirees ("Beneficiaries"). One benefit the Park and Planning Commission offers Beneficiaries is paying a substantial share of the purchase price of Beneficiaries' pharmaceutical drugs, including the at-issue diabetes medications, as further defined below.

---

[37] *Id.*

[38] *Health & Benefits Office*, M-NCPPC, https://www.mncppc.org/health-benefits-office/ (last visited Jan. 12, 2025).

45.    Insulin drugs, including those manufactured by the Manufacturer Defendants, are a significant prescription expense for the Park and Planning Commission. As prices continued to rise over the past several years, Plaintiff spent substantial public monies on overcharges to the detriment of its Beneficiaries, employees, and M-NCPPC programs and services.

46.    Plaintiff seeks relief for the harm suffered as a result of Defendants' misrepresentations and omissions regarding their illegal Insulin Pricing Scheme.

**B.    Manufacturer Defendants**

47.    As set forth above, Defendants Eli Lilly, Novo Nordisk, and Sanofi are all manufacturers of insulin, analog insulin, and other diabetes medications.

**1.    Eli Lilly**

48.    Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its principal place of business in Indianapolis, Indiana.

49.    Eli Lilly manufactures, promotes, and/or distributes several at-issue diabetes medications in Maryland, including: Humulin N (first approved in 1982), Humulin R (first U.S. approval in 1982), Humalog (first approved in 1996), Trulicity (first approved in 2014), and Basaglar (first approved in 2015).

50.    Eli Lilly transacts business in Maryland by targeting the local market with its products, including the at-issue diabetes medications. From 2019 to 2021,

Eli Lilly's domestic revenues were $11.9 billion from Trulicity, $4.48 billion from Humalog, $2.58 billion from Humulin, and $2.31 billion from Basaglar.

51.    Eli Lilly also directs advertising and informational materials to Maryland and Maryland physicians and potential users of Eli Lilly's products and employs sales representatives throughout Maryland to promote and sell its diabetes medications.

52.    At all relevant times, in furtherance of the Insulin Pricing Scheme, Eli Lilly caused the publication of prices for the at-issue diabetes medications throughout Maryland with the express knowledge that payment by the Park and Planning Commission would be based on those false list prices.

53.    During the relevant period, M-NCPPC purchased Eli Lilly's at-issue drugs at prices through its employee health plans based on false list prices generated by the Insulin Pricing Scheme.

### 2.    Sanofi-Aventis

54.    Defendant Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

55.    Sanofi manufactures, promotes, and/or distributes pharmaceutical drugs in Maryland, including several at-issue diabetes medications: Lantus (first approved in 2000), Apidra (first approved in April 2004), Toujeo (first approved in 2015), and Soliqua (first approved in 2016).

56.    Sanofi transacts business in Maryland by targeting the local market with its products, including the at-issue diabetes medications. In 2019, Sanofi's U.S. net sales were $1.29 billion from Lantus, $323.7 million from Toujeo, and $51.5 million from Apidra.

57.    Sanofi directs advertising and informational materials to Maryland physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in Maryland and profiting from the Insulin Pricing Scheme.

58.    At all relevant times, in furtherance of the Insulin Pricing Scheme, Sanofi caused the publication of prices of its at-issue diabetes medications in Maryland for the purpose of payment by payors, including M-NCPPC.

59.    During the relevant period, Plaintiff purchased Sanofi's at-issue drugs through its employee health plans at prices based on false list prices generated by the Insulin Pricing Scheme.

### 3.    Novo Nordisk

60.    Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation with its principal place of business in Plainsboro, New Jersey.

61.    Novo Nordisk manufactures, promotes, and/or distributes pharmaceutical drugs in Maryland, including several at-issue diabetes medications: Novolin R (first approved in 1991), Novolin N (first approved in 1991), Novolog

(first approved in 2002), Levemir (first approved in 2005), Victoza (first approved in 2010), Tresiba (first approved in 2015), and Ozempic (first approved in 2017). Novo Nordisk's combined net sales of these drugs in the U.S. from 2018 to 2020 totaled approximately $18.1 billion.

62.    Novo Nordisk transacts business in Maryland by targeting the local market with its products, including the at-issue diabetes medications. In 2015, Novo Nordisk's revenue from Novolog was $3.03 billion, and its revenue from Levemir was $2.68 billion.

63.    Novo Nordisk directs advertising and informational materials to Maryland and Maryland physicians and potential users of Novo Nordisk's products.

64.    At all relevant times, in furtherance of the Insulin Pricing Scheme, Novo Nordisk caused the publication of prices of its at-issue diabetes medications in Maryland for the purpose of payment by payors, including M-NCPPC.

65.    During the relevant period, Plaintiff purchased Novo Nordisk's at-issue drugs through its employee health plans at prices based on false list prices generated by the Insulin Pricing Scheme.

C.    **PBM Defendants**

1.    **CVS Caremark and Zinc Health Services, LLC**

66.    Collectively, Defendants CVS Health Corporation ("CVS Health"), CVS Pharmacy, Inc., Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark, L.L.C., including all predecessor and successor entities, are referred to as "CVS Caremark."

67.    Defendant CVS Health is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island.

68.    CVS Health is a pharmacy benefit manager that contracts on behalf of health plans and insurers with the Manufacturer Defendants for purchase of the analog insulin medications that the manufacturers make. CVS Health Corporation provides comprehensive prescription benefit management services to numerous health plans, including corporations, managed care organizations, insurance companies, unions, and government entities. CVS Health transacts business and has locations throughout the United States and Maryland.

69.    Defendant CVS Pharmacy, Inc. ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. It is a citizen of the State of Rhode Island. CVS Pharmacy is a wholly-owned subsidiary of CVS Health. During the relevant period, CVS Pharmacy

provided retail pharmacy services in Maryland that gave rise to and facilitated the Insulin Pricing Scheme which damaged payors, including Plaintiff.

70.    Defendant Caremark Rx, L.L.C. is a Delaware limited liability company whose principal place of business is in Rhode Island. Caremark Rx, L.L.C. is a subsidiary of Defendant CVS Pharmacy, which is a wholly-owned subsidiary of Defendant CVS Health.

71.    Defendant CaremarkPCS Health, L.L.C. is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CaremarkPCS Health, L.L.C. is a subsidiary of CaremarkPCS, L.L.C., which is a subsidiary of Caremark Rx, L.L.C., which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health. During the relevant period, CaremarkPCS Health, L.L.C. provided the PBM services to M-NCPPC, such as offering formularies that included the diabetes medications at issue here. CaremarkPCS Health, L.L.C. participated in pricing these drugs based off the list prices it knew to be false and thereby implemented the Insulin Pricing Scheme that damaged payors, including Plaintiff. CaremarkPCS Health, L.L.C. is directly involved in both the PBM and mail-order pharmacy services giving rise to and in furtherance of the Insulin Pricing Scheme.

72.    Defendant Caremark, L.L.C. is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark,

L.L.C. is a subsidiary of Caremark Rx, L.L.C., which is a subsidiary of Defendant CVS Pharmacy, which is a wholly owned subsidiary of Defendant CVS Health.

73.    Defendants CVS Health, CVS Pharmacy, Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark, L.L.C. all operate as a single business entity, doing business as CVS Caremark. As a result of their numerous overlapping directorships and shared executives, each entity is directly involved in the conduct and control of CVS Caremark's operations, management, and business decisions related to the at-issue diabetic medications. For example:

A.    During the relevant period, the CVS Caremark entities had common officers and directors, including:

i.    Thomas S. Moffatt, Vice President and Secretary of Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark, L.L.C., also served as Vice President, Assistant Secretary, and Senior Legal Counsel at CVS Health and as Vice President, Secretary and Senior Legal Counsel of CVS Pharmacy;

ii.    Melanie K. Luker, Assistant Secretary of Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark, L.L.C., also served as Manager of Corporate Services at CVS Health;

iii.     Carol A. Denale, Senior Vice President and Treasurer of Caremark Rx, L.L.C., also served as Senior Vice President, Treasurer, and Chief Risk Officer at CVS Health;

iv.     John M. Conroy was VP of Finance at CVS Health in 2011 and President and Treasurer of Caremark, L.L.C. and CaremarkPCS Health, L.L.C. in 2019; and

v.     Sheelagh Beaulieu served as Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health, L.L.C. and Caremark, L.L.C.

B.     CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, L.L.C., which owns all the stock of Caremark LLC. CVS Health directly or indirectly owns CaremarkPCS Health, L.L.C. in its entirety.

C.     The corporate entities within CVS Health do not operate as separate entities. CVS Health's public filings, documents, and statements present its subsidiaries—including CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C., and CaremarkPCS Health, L.L.C. as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." CVS Health's recent public filings also

disclose that the company "operates a group purchasing organization that negotiates pricing for the purchase of pharmaceuticals and rebates with pharmaceutical manufacturers on behalf of its participants," without identifying Zinc by name.[39] The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint.

D.    All executives of CaremarkPCS Health, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., CVS Pharmacy, and Zinc Health Services, LLC ultimately report to the executives at CVS Health, including its President and CEO.

74.    In 2020, Defendant CVS Caremark created its rebate aggregator, Zinc Health Services, LLC ("Zinc"). Zinc is a Delaware limited liability company with its principal place of business at One CVS Drive, Woonsocket, Rhode Island.

75.    Zinc is a direct subsidiary of CVS Pharmacy, which is a direct subsidiary of CVS Health.

76.    Zinc negotiates and enters into rebate contracts with the Manufacturer Defendants on behalf of Defendant CVS Caremark. Hereinafter, references to actions by Defendant CVS Caremark include actions taken by Zinc on behalf of

---

[39] CVS Health Corp. Form 10-K, FYE Dec. 31, 2020, 2021, 2022, 2023.

Defendant CVS Caremark. During the relevant period, Zinc negotiated rebates with the Manufacturers for the at-issue drugs sold and distributed in Maryland.

77.    CVS Caremark offered pharmacy benefit services to Maryland payors, including Plaintiff, and derived substantial revenue therefrom. In doing so, it made misrepresentations while concealing the Insulin Pricing Scheme and utilized the false prices generated by the Insulin Pricing Scheme.

78.    CVS Caremark contracted with Plaintiff M-NCPPC to provide PBM services.

79.    During the relevant period, CVS Caremark provided PBM services to M-NCPPC and, in doing so, set the prices that the Park and Planning Commission paid for these at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme.

80.    At all relevant times, CVS Caremark dispensed the at-issue insulin medications directly to the Park and Planning Commission's Beneficiaries through its retail pharmacies and indirectly through partner pharmacies, charged prices based on the false list prices generated by the Insulin Pricing Scheme, and derived substantial revenue from these activities in Maryland. Indeed, in 2021, CVS Caremark's own pharmacy, CVS Pharmacy Inc., issued the most prescriptions to M-NCPPC plan participants and beneficiaries. Of all retail pharmacy chains, CVS Pharmacy Inc. issued approximately 20 times more prescriptions than the second

closest pharmacy, and CVS Pharmacy Inc. prescriptions reflected approximately 80% of all prescriptions issued to M-NCPPC plan participants and beneficiaries.

81.    M-NCPPC paid CVS Caremark directly for the at-issue drugs on a regular basis.

82.    In short, CVS Caremark played a critical role in the overall Insulin Pricing Scheme and its direct contact with the Park and Planning Commission caused harm to M-NCPPC.

83.    CVS Caremark also purchased drugs from manufacturers to dispense through its pharmacy network.

84.    In its capacity as a retail pharmacy, CVS Caremark knowingly profited from the false list prices generated through the Insulin Pricing Scheme by pocketing the difference between the acquisition cost for the at-issue drugs (an amount well below the list price published through the Insulin Pricing Scheme), and the amounts it received from payors (amounts based on the false list prices).

85.    At all relevant times, CVS Caremark had express agreements with Defendants Eli Lilly, Novo Nordisk, and Sanofi related to the payments by the Manufacturer Defendants to CVS Caremark.

## 2.    Express Scripts and Ascent Health Services LLC

86.    Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Medco

Health Solutions, Inc., and The Cigna Group, including all predecessor and successor entities, are referred to as "Express Scripts."

87.    Defendant Evernorth Health, Inc. ("Evernorth"), formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business in St. Louis, Missouri. Evernorth Health, Inc. is a wholly owned subsidiary of The Cigna Group. Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction related to the Insulin Pricing Scheme, including with respect to the at-issue drugs. Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries operating in Maryland, who engaged in the activities giving rise to this action.

88.    Defendant Express Scripts, Inc. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth. Express Scripts, Inc. holds one or more pharmacy licenses in Maryland. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Maryland that engaged in the conduct giving rise to this action.

89.    Defendant Express Scripts Administrators, LLC, doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited

liability company and wholly owned subsidiary of Evernorth. Its principal place of business is in Franklin Lakes, New Jersey.

90.    Defendant Express Scripts Pharmacy, Inc. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth. During the relevant period, Express Scripts Pharmacy, Inc. provided mail-order pharmacy services in Maryland that facilitated the Insulin Pricing Scheme, which damaged payors such as M-NCPPC.

91.    Defendant Medco Health Solutions, Inc. is a Delaware corporation with its principal place of business in Franklin Lakes, New Jersey. Medco Health Solutions, Inc. is a wholly owned subsidiary of The Cigna Group. Prior to 2012, Medco provided the at-issue PBM and mail-order pharmacy services in Maryland; following its merger with Express Scripts in 2012, Medco continued to provide those services under the Express Scripts name.

92.    Defendant The Cigna Group is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. The Cigna Group, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies related to the Insulin Pricing Scheme that inform its PBM services and formulary construction, including with respect to the at-issue drugs. The Cigna Group is the immediate or indirect parent of pharmacy

and PBM subsidiaries operating in Maryland, who engaged in the activities giving rise to this action.

93.    In 2019, Defendant Express Scripts created its rebate aggregator, Ascent Health Services LLC ("Ascent"). Ascent is a Delaware limited liability company with its principal place of business at Mühlentalstrasse 36, 8200 Schaffhausen, Switzerland.

94.    Ascent is part of Evernorth and a subsidiary of Cigna Corporation.

95.    Defendant Express Scripts co-owns Ascent and Ascent negotiates and enters into rebate contracts with the Manufacturer Defendants on behalf of Defendant Express Scripts. Hereinafter, references to actions by Defendant Express Scripts include actions taken by Ascent on behalf of Defendant Express Scripts.

96.    During the relevant period, Ascent negotiated rebates with the Manufacturers for the at-issue drugs sold and distributed in Maryland.

97.    Express Scripts offered pharmacy benefit services to Maryland payors and derived substantial revenue therefrom. In doing so, it made misrepresentations while concealing the Insulin Pricing Scheme and utilized the false prices generated by the Insulin Pricing Scheme.

98.    At all relevant times, Express Scripts dispensed the at-issue insulin medications through its mail service and participating retail pharmacies and indirectly through partner pharmacies, charged prices based on the false list prices

generated by the Insulin Pricing Scheme, and derived substantial revenue from these activities in Maryland.

99.    In short, Express Scripts played a critical role in the overall Insulin Pricing Scheme and caused harm to M-NCPPC.

100.    Express Scripts also purchased drugs from manufacturers to dispense through its pharmacy network.

101.    In its capacity as a mail service pharmacy and through its participating retail pharmacies, Express Scripts knowingly profited from the false list prices generated through the Insulin Pricing Scheme by pocketing the difference between the acquisition cost for the at-issue drugs (an amount well below the list price published through the Insulin Pricing Scheme), and the amounts it received from payors (amounts based on the false list prices and, in many cases, set by Express Scripts in its capacity as a PBM).

102.    At all relevant times, Express Scripts had express agreements with Defendants Eli Lilly, Novo Nordisk, and Sanofi related to the payments by the Manufacturer Defendants to Express Scripts, as well as agreements related to Manufacturers' at-issue drugs sold through Express Scripts' pharmacies.

### 3.    OptumRx and Emisar Pharma Services LLC

103.    Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

104.    Defendant UnitedHealth Group, Inc. ("UnitedHealth Group") is a corporation organized under the laws of Delaware with its principal place of business in Minnetonka, Minnesota. UnitedHealth Group is a diversified managed healthcare company that offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries, and prescription drugs through its PBM, OptumRx. Its total revenues in 2021 exceeded $287 billion, an increase of $30 billion from the prior year. The company has been ranked fifth on the Fortune 500 list. UnitedHealth Group's conduct had a direct effect in Maryland and damaged Plaintiff.

105.    UnitedHealth Group states in its annual reports that UnitedHealth Group utilizes "Optum's capabilities to help coordinate and provide patient care, improve affordability of medical care, analyze cost trends, manage pharmacy care services, work with care providers more effectively and create a simpler and more satisfying consumer and physician experience."[40] Its most recent annual report states plainly that UnitedHealth Group is "involved in establishing the prices

---

[40] *See, e.g.*, UnitedHealth Group Form 10-K, at 3 (FYE Dec. 31, 2023).

charged by retail pharmacies, determining which drugs will be included in formulary listings and selecting which retail pharmacies will be included in the network offered to plan sponsors' members[.]"[41] As of December 31, 2021, UnitedHealth Group's "total pharmaceutical manufacturer rebates receivable included in other receivables in the Consolidated Balance Sheets amounted to $7.2 billion [2021] and $6.3 billion [2020]."[42]

106. Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc. Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Maryland and damaged Plaintiff.

107. For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." In this

---

[41] *Id.* at 44.
[42] *See* UnitedHealth Group Form 10-K, at 54–55 (FYE Dec. 31, 2021)

role, Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx," and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform at-issue formulary construction and mail-order activities.

108.    Defendant OptumRx, Inc. is a California corporation with its principal place of business in Irvine, California. OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Defendant Optum, Inc. During the relevant period, OptumRx, Inc. provided PBM and mail-order pharmacy services in Maryland, such as offering formularies that included the diabetes medications at issue here. OptumRx, Inc. participated in pricing these drugs based off the list prices it knew to be false and thereby implemented the Insulin Pricing Scheme, which damaged Plaintiff. OptumRx is named as a Defendant in its dual capacity as a PBM and mail-order pharmacy.

109.    In 2021, Defendant OptumRx founded its rebate aggregator, Emisar Pharma Services LLC ("Emisar"). Emisar is a Delaware limited liability company with its principal place of business at 1 Optum Circle, Eden Prairie, Minnesota 55344 and operations in the United States and Ireland.

110.    Emisar is a wholly owned indirect subsidiary of UnitedHealth Group, Inc.

111.    Emisar negotiates and enters into rebate contracts with the

Manufacturer Defendants on behalf of Defendant OptumRx. Hereinafter, references to actions by Defendant OptumRx include actions taken by Emisar on behalf of Defendant OptumRx.

112.    During the relevant period, Emisar negotiated rebates with the Manufacturers for the at-issue drugs sold and distributed in Maryland.

113.    OptumRx is a pharmacy benefit manager and, as such, coordinates with Eli Lilly, Novo Nordisk, and Sanofi regarding the price of at-issue diabetes medications, as well as for the placement of these entities' diabetes medications on OptumRx's drug formularies.

114.    OptumRx provides pharmacy care services to more than 65 million Americans through a network of more than 67,000 retail pharmacies and multiple delivery facilities. It is one of UnitedHealth Group's "four reportable segments" (along with UnitedHealthcare, Optum Health, and Optum Insight). In 2021, OptumRx "managed $112 billion in pharmaceutical spending, including $45 billion in specialty pharmaceutical spending."[43]

115.    OptumRx, through UnitedHealth Group, offered pharmacy benefit services to Maryland payors, including Plaintiff, and derived substantial revenue therefrom. In doing so, it made misrepresentations while concealing the Insulin

---

[43] Denise Myshko, *Optum Rx Revenue Gros 9%in 2022*, Managed Healthcare Exec. (Jan. 13, 2023), https://www.managedhealthcareexecutive.com/view/optum-rx-revenue-grows-9-in-2022.

Pricing Scheme and utilized the false prices generated by the Insulin Pricing Scheme.

116.   At all relevant times, OptumRx offered PBM services nationwide and maintained standard formularies that were used nationwide, including in Maryland.

117.   During the relevant period, OptumRx dispensed the at-issue medications nationwide through its pharmacies. OptumRx derived substantial revenue from these activities in Maryland.

118.   In short, OptumRx played a critical role in the overall Insulin Pricing Scheme as a co-conspirator and caused harm to M-NCPPC.

119.   OptumRx purchased drugs directly from manufacturers to dispense through its pharmacy network.

120.   In its capacity as a retail pharmacy, OptumRx knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the difference between the acquisition cost for the at-issue drugs (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts it received from payors (which amounts were based on the false list prices and, in many cases, were set by OptumRx in its capacity as a PBM).

121.   At all relevant times, OptumRx provided pharmacy services nationwide and within Maryland using prices based on the false list prices generated by the Insulin Pricing Scheme, dispensed the at-issue medications within

Maryland through its pharmacies, and derived substantial revenue from these activities in Maryland.

### III.   JURISDICTION AND VENUE

122.   Pursuant to this Court's Case Management Order No. 9 ("CMO 9"), this Complaint is filed as an original action in the United States District Court for the District of New Jersey.

123.   But for CMO 9, Plaintiff would have filed this Complaint in the United States District Court for the District of Maryland (hereinafter, the "District of Maryland"). In accordance with CMO 9, the "Designated Forum" for this action is the District of Maryland.

124.   The District of Maryland has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. The District of Maryland also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

125.   The District of Maryland has personal jurisdiction over Defendants. Each Defendant: (1) transacts business in Maryland; (2) maintains substantial contacts in Maryland, and (3) committed the violations of federal and state law at issue in this action, within the State of Maryland. This action arises out of and relates to each Defendant's contacts with this forum.

Complaint- 44

126.    The Insulin Pricing Scheme has been directed at and has had the foreseeable and intended effect of causing injury to persons residing in, located in, or doing business in Maryland, including Plaintiff. All transactions at issue occurred in the State of Maryland and/or involved Maryland residents.

127.    Each Defendant purposefully availed itself of the privilege of doing business within Maryland and each derived substantial financial gain from doing so. These continuous, systematic, and case-related business contacts—including the tortious acts described herein—are such that each Defendant should reasonably have anticipated being brought into the District of Maryland.

128.    Each Defendant submitted itself to jurisdiction through marketing, encouraging the use of its services, and its purposeful cultivation of profitable relationships in the State of Maryland and within this forum.

129.    The District of Maryland has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Maryland.

130.    The District of Maryland also has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b). The District of Maryland may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates Defendants' national contacts. The interests of justice require that Plaintiff be allowed to bring all members of the

nationwide RICO enterprise before the District of Maryland in a single action for a single trial.

131.    Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because a substantial part of the events or omissions giving rise to this action took place, or had their ultimate injurious impact, within the District of Maryland. In particular, at all times during the relevant period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, provided retail pharmacies, employed sales representatives, promoted and sold diabetes medications; caused and directed the published prices of the at-issue drugs; and manufactured, distributed, and sold the at-issue drugs in and caused injury to Plaintiff in the District of Maryland.

132.    Venue is proper in the District of Maryland pursuant to 18 U.S.C. § 1965, because all Defendants reside, are found, have an agent, or transact their affairs in the District of Maryland, and the ends of justice require that any Defendant residing elsewhere be brought into the District of Maryland.

## IV.    FACTUAL ALLEGATIONS

**A.    Life-Saving Insulin Is Not a New Drug.**

**1.    Diabetes Requires Insulin.**

133.    Diabetes is a condition in which the body does not properly process food for use as energy. The hormone insulin controls the rate at which food is converted to glucose, or sugar. In a non-diabetic person, the pancreas secretes insulin into the bloodstream, where converted glucose is used by the body as energy. People with diabetes are unable to make enough insulin or cannot process it as effectively as necessary, causing glucose to build up in the bloodstream. Consistently high levels of blood glucose pose a number of serious health risks including "heart disease, vision loss, and kidney disease."[44] Diabetes-related complications are the "eighth leading cause of death in the United States."[45] Though treatable, diabetes can be fatal or severely debilitating if left untreated.

134.    As of 2021, 38.4 million people in the United States, or 11.6% of the population, had diabetes—and that number continues to grow.[46] The most common

---

[44] Ctr.'s for Disease Control & Prevention, *supra* n.4.
[45] Am. Diabetes Assoc., *supra* n.3.
[46] *National Diabetes Statistics Report*, Ctrs. for Disease Control & Prevention (May 15, 2024), https://www.cdc.gov/diabetes/php/data-research/?CDC_Aaref_Val=https://www.cdc.gov/diabetes/data/statistics-report/index.html.

types of diabetes in the U.S. are type 1, type 2, and gestational diabetes.[47] Individuals with type 1 diabetes are unable to produce insulin at all, as their immune system attacks and destroys insulin-making cells in the pancreas.[48] People with type 2 diabetes—about 95% of cases of diabetes in adults—are able to produce insulin, but unable to use it effectively.[49] Regular use of prescription insulin is necessary to treat both type 1 and type 2 diabetes to prevent life-threatening health complications.[50]

135.   At issue in this lawsuit are several insulin medications as well as other medications used to treat type 2 diabetes. The following is a table of diabetes medications at issue in this lawsuit:

| Insulin Type | Action | Name | Company | FDA Approval | Current/Recent List Price |
|---|---|---|---|---|---|
| **Human** | *Rapid-Acting* | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | *Intermediate* | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |

---

[47] *What is Diabetes?,* Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, https://www.niddk.nih.gov/health-information/diabetes/overview/what-is-diabetes (last reviewed Apr. 2023).

[48] *Id.*

[49] Am. Diabetes Assoc., *supra* n.3.

[50] Valencia Higuera, *Everything You Need to Know About Insulin,* Healthline (Apr. 20, 2023), http://www.healthline.com/health/type-2-diabetes/insulin.

| | | | | | |
|---|---|---|---|---|---|
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| **Analog** | *Rapid-Acting* | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | *Pre-mixed* | Humalog 50/50 | Eli Lilly | 1999 | $93 (vial) $180 (pens) |
| | | Humalog 75/25 | Eli Lilly | 1999 | $99 (vial) $140 (pens) |
| | | Novolog 70/30 | Novo Nordisk | 2001 | $203 (vial) $246 (pens) |
| | *Long-Acting* | Lantus | Sanofi | 2000 | $340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $370 (vial) $555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2015 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| **Type 2 Non-Insulin Medications** | | Trulicity (Dulaglutide) | Eli Lilly | 2014 | $1013 (pens) |
| | GLP-1 | Mounjaro (Tirzepatide/GIP) | Eli Lilly | 2022 | $1068 (pens) |
| | | Victoza (Liraglutide) | Novo Nordisk | 2010 | $813 (2 pens) $1220 (3 pens) |
| | | Xultophy (insulin degludec/liraglutide) | Novo Nordisk | 2016 | $1295 (pens) |
| | | Ozempic (Semaglutide) | Novo Nordisk | 2017 | $1022 (pens) |
| | | Rybelsus (semaglutide tablets) | Novo Nordisk | 2019 | $1029 (30 day supply) |
| | | Adylxin (lixisenatide) | Sanofi | 2016 | Discontinued 2023 |
| | | Soliqua (insulin glargine/lixisenatide) | Sanofi | 2016 | $928 (pens) |

Complaint- 49

2.    **Discovery and History of Insulin**

136.    Until 1922, diabetes was considered a death sentence, but that changed with the discovery of insulin in the pancreas of dogs in 1921 by an unknown orthopedic surgeon, Dr. Frederic Banting, and a medical student, Charles Best, at the University of Toronto.[51] Less than a year later, in 1922, Banting and Best used the hormone to successfully treat human patients.[52]

137.    In an act of gratitude and humanitarianism, Banting and Best sold the patent for insulin to the University of Toronto for just one dollar.[53] "It was the best way, they believed, to ensure that no company would have a monopoly and patients would have affordable access to a safe, effective drug."[54]

138.    In order to facilitate widespread distribution of the medication, the University of Toronto partnered with drug manufacturers in the United States and abroad, including Eli Lilly, which as early as 1923 was producing enough insulin to supply the entire North American continent. In exchange for this assistance with

---

[51] *History of Insulin*, Diabetes.co.uk (Oct. 29, 2023), http://www.diabetes.co.uk/insulin/history-of-insulin.html.
[52] *Id.*
[53] Serena Gordon, *Insulin prices skyrocket, putting many diabetics in a bind*, Chi. Trib. (June 19, 2018), https://www.chicagotribune.com/2016/11/30/insulin-prices-skyrocket-putting-many-diabetics-in-a-bind/.
[54] Carolyn Y. Johnson, *Why treating diabetes keeps getting more expensive*, Wash. Post (Oct. 31, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years.

widespread insulin distribution, however, the University gave up its exclusive control over the patent for insulin to private manufacturers.[55]

139.   Nevertheless, for years, the drug was made widely available at a low cost. In fact, the New York Times estimated that, in 1924, many patients received the drug for less than seven cents a week in 2016 dollars.[56]

140.   The earliest insulin available to the public was derived from cow and pig hormones and, until the 1980s, this "animal-derived" insulin was the only treatment for diabetes.[57] Although effective, animal-derived insulin created the risk of an allergic reaction in many human patients. That risk was lessened in 1982 when synthetic insulin, or "human insulin," was developed and marketed by Eli Lilly and other manufacturers, after insulin became the first protein in history to be sequenced and chemically synthesized.[58] This type of insulin was marketed as Humulin R (rapid) and N (NPH, intermediate-acting).[59]

141.   But, even after the development of "human insulin," doctors found that "there's no one insulin that's right for everyone," and each diabetes patient

---

[55] Gordon, *supra* n.53.
[56] Hirsch, *supra* n.34.
[57] *Animal Insulin*, Diabetes.co.uk (Oct. 29, 2023), http://www.diabetes.co.uk/insulin/animal-insulin.html.
[58] *History of Insulin*, *supra* n.51.
[59] Celeste C. Quianzon & Issam Cheikh, MD, *History of insulin*, J. Cmty. Hosp. Intern. Med. Perspect. (July 16, 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3714061/.

may react differently to each formulation of the protein.[60] This recognition gave rise to "analog insulin," the most recent iteration of insulin available on the market today.

142.    Analog insulin is a "genetically modified form of insulin whereby the amino acid sequence is altered to change how the insulin is absorbed, distributed, metabolized and excreted."[61]

143.    Analog insulins are closely related to the human insulin structure and were developed for specific aspects of glycemic control in terms of fast action (prandial insulins) and long action (basal insulins). The first biosynthetic insulin analog was developed by Eli Lilly for clinical use at mealtime (prandial insulin): Humalog (insulin lispro). Humalog is more rapidly absorbed after subcutaneous injection than regular insulin, with an effect just fifteen minutes after injection. Other rapid-acting analog insulins with similar profiles are Novolog (insulin aspart) and Apidra (insulin glulisine). These are often used in combination with longer-acting insulins Lantus and Levemir. These rapid-acting and long-acting analog insulins were introduced in the U.S. between 1996 and 2006. They replaced older animal insulins that had been developed during the 1920s and regular "human"

---

[60] Gordon, *supra* n.53.
[61] *History of Insulin, supra* n.51.

insulin (e.g., Lente, Humulin) that was developed in the 1970s and marketed in the early 1980s.

144.   When first introduced, analog insulins were affordable, and remained so for many years after. Today, however, Defendants' Insulin Pricing Scheme has resulted in extreme price increases that have put the 100-year-old medicine out of reach for many people in the United States with diabetes.[62]

145.   The newer, analog insulins provide important benefits over older "human" insulin for some people with diabetes. As the mother of a diabetic child explained, older types of insulin require diabetics to follow rigid meal schedules that correspond to insulin doses so that they can avoid blood sugar fluctuations.[63]

146.   More modern analog insulins, such as Humalog, which is rapid acting, and Lantus, a long-acting insulin, can help diabetics maintain blood sugar levels and improve their quality of life.[64] The analog insulins are particularly important for children, who face a higher risk of nocturnal hypoglycemia; there is a known

---

[62] Hirsch, *supra* n.34.
[63] Nicki Nichols, *Why Walmart Insulins Aren't the Answer to High Insulin Prices,* Insulin Nation (Sept. 16, 2016), http://insulinnation.com/treatment/why-walmart-insulins-arent-the-answer-to-high-insulin-prices/.
[64] *See id.*

prevalence of dead-in-bed syndrome among children and young adults with type 1 diabetes.[65]

147.   The prices of the at-issue insulin drugs have gone through the roof since they have been on the market.

### 3.    The Unavailability of Generic Insulin.

148.   While generic forms of many drugs are available to purchase for as little as a few dollars, in the United States there is no true generic form of insulin. Even though insulin was first extracted nearly 100 years ago, only three major pharmaceutical companies hold patents in the United States that allow them to manufacture insulin.[66] Part of the reason that no generic insulin is available in the United States may be that large-molecule biologic drugs, such as insulin, are more difficult to copy than small-molecule drugs.[67] But insulin manufacturers also have incrementally changed their insulin products, and "the trailing edge of old insulin products did not generate a market for generic competition but rather became a set of obsolete products that were promptly removed from the U.S. market."[68] Even

---

[65] A.M. Secrest et al., *Characterizing sudden death and dead-in-bed syndrome in Type 1 diabetes*, 28 Diabetes Med. 7, 293–300 (Mar. 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3045678/.

[66] *See* Lipska, *supra* n.33.

[67] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172–73 (2015), https://www.nejm.org/doi/full/10.1056/NEJMms1411398.

[68] *Id.* at 1174.

when practitioners prescribe cheaper versions of insulin that are still available in the United States, the prescriptions instead are filled with newer recombinant products.[69]

149.  In 2019, Eli Lilly introduced a lower-priced insulin called Lispro—a "generic" version of their analog Humalog insulin.[70] But Eli Lilly has not lived up to its promise to make insulin more affordable for Americans. In 2023, a study conducted by the offices of Senators Elizabeth Warren, Richard Blumenthal, and Raphael Warnock found that "[w]hile Eli Lilly's list price for [Lispro] was $25, the average cost of Lispro at the pharmacy—without health insurance coverage—was $97.51," with the most expensive pharmacy in the study pricing Lispro at $330.[71]

**B.    The Insulin Market Is Enormous.**

150.  More than 34 million Americans live with diabetes, and another 88 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes. Diabetes is a significant source of health care

---

[69] *Id.*

[70] *Lilly to Introduce Lower-Priced Insulin*, Lilly: Invs. (Mar. 4, 2019), https://investor.lilly.com/news-releases/news-release-details/lilly-introduce-lower-priced-insulin.

[71] Kelsey Waddill, *Generic Insulin Drug Pricing, Access Still Pose Problems for Uninsured*, TechTarget (July 17, 2023), https://healthpayerintelligence.com/news/generic-insulin-drug-pricing-access-still-pose-problems-for-uninsured.

costs. One in four health care dollars nationwide—and one in three Medicare dollars—is spent caring for people with diabetes.[72]



---

[72] *New American Diabetes Association Report Finds Annual Costs of Diabetes to be $412.9 Billion*, Am. Diabetes Assoc. (Nov. 1, 2023), https://diabetes.org/newsroom/press-releases/new-american-diabetes-association-report-finds-annual-costs-diabetes-be; Adam Edelstein, *Affordable Insulin Now Act Includes a Monthly Out-Of-Pocket Patient Maximum of $35 for Insulin Prescriptions*, UMass Diabetes Ctr. of Excellence, https://www.umassmed.edu/dcoe/news/umass-diabetes-news/2022/02/affordable-insulin-now-act (last visited Dec. 27, 2024).

151.    Thus, millions of purchasers of insulin whose lives depend on the drug are captive to the market manipulation and other harmful aspects of Defendants' Insulin Pricing Scheme that has unlawfully hiked the price of this needed drug.

152.    This conduct occurred throughout the United States and its territories and concerned the at-issue drugs listed in the table above.

153.    As evidence of the astronomical prices of the at-issue drugs, revenue from the top-selling analog insulins tops $15.9 billion: $6.98 billion for Sanofi's Lantus and $376 million for its Apidra;[73] $3.03 billion for Novo Nordisk's NovoLog and $2.68 billion for its Levemir;[74] and $2.84 billion for Eli Lilly's Humalog.[75] By 2031, the global insulin market is expected to top $105 billion.[76] The high cost of this needed drug has severely limited access and hurt patients physically, financially, and psychologically.

## C.    The Pharmaceutical Supply and Payment Chains

154.    Just as only three large companies—Eli Lilly, Novo Nordisk, and Sanofi—manufacture insulin for the entire United States market, there are three large pharmacy benefit managers that control the vast majority of the PBM market.

---

[73] Sanofi, Annual Report (Form 20-F) (Mar. 3, 2017) at 24.
[74] *The world's top selling diabetes drugs*, Pharm. Tech. (Mar. 29, 2016), http://www.pharmaceutical-technology.com/features/featurethe-worlds-top-selling-diabetes-drugs-4852441/.
[75] *Id.*
[76] *Global Insulin Market $105 Billion by 2031*, iHealthcareAnalyst (July 2, 2024), https://www.ihealthcareanalyst.com/global-human-insulin-market/.

PBM Defendants CVS Caremark, Express Scripts, and OptumRx control nearly 80% of the PBM market and exercise enormous control over the cost of insulin in tandem with the Manufacturer Defendants.

155.    Pharmaceutical products originate in manufacturing sites; are transferred to wholesale distributors (in the case of insulin); are stocked at retail, mail-order, and other types of pharmacies; are subject to price negotiations and processed through quality and utilization management screens by pharmacy benefit managers; are dispensed by pharmacies; and ultimately are delivered to and taken by patients.[77]

156.    The technical function of a pharmacy benefit manager is to administer a health coverage provider's prescription drug program. A pharmacy benefit manager develops the coverage provider's drug formulary (the list of drugs included in coverage at various pricing "tiers"), processes claims, creates a network of retail pharmacies that provide discounts in exchange for access to a provider's plan participants, and negotiates with pharmaceutical manufacturers. Often, pharmacy benefit managers are also responsible for performing drug utilization reviews. Pharmacy benefit managers also contract with a network of retail and community pharmacies. Pharmacies agree to dispense prescription drugs to

---

[77] Kaiser Family Foundation, *Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain*, Health Strategies Consultancy LLC (Mar. 2005), https://www.kff.org/other/report/follow-the-pill-understanding-the-u-s/.

covered patients. The contract provides for a payment rate for each prescription, plus a dispensing fee. Pharmacies are also responsible for collecting patient cost-sharing payments. Many pharmacy benefit managers also own mail-order and specialty pharmacies, which directly supply prescription drugs to patients.

157.   In addition, and of particular significance here, pharmacy benefit managers have contractual relationships with pharmaceutical manufacturers. Pharmacy benefit managers negotiate rebates, fees, and other concessions with the manufacturers. These relationships allow pharmacy benefit managers to exert tremendous influence and control over what drugs are made available to health plans and insureds.

158.   The following figure illustrates the flow of funds, products, and services between pharmaceutical manufacturers, pharmacy benefit managers, health plans, health plan sponsors, drug wholesalers, pharmacies, and beneficiaries. Importantly, this figure does not include all relevant relationships and entities, nor does this figure capture the vertical integration that occurs between and amongst some of these entities.

Conceptual Model of the Flow of Products, Services, and Funds for Non-Specialty Drugs Covered under Private Insurance and Purchased in a Retail Setting[78]



159.   At a high level, the complex supply chain for the flow of brand-name drugs, including the at-issue insulin drugs, generally works as follows: (1) the manufacturer sells a drug to a wholesaler at a discounted rate; (2) the wholesaler marks up the drug and sells it to the pharmacy; (3) the pharmacy fills the prescription for a beneficiary; and (4) the pharmacy benefit manager reimburses the pharmacy for the drug resulting in a meager amount of profit (if not a loss) for the pharmacy.

160.   This case centers, however, not on the flow of brand-name drugs through the system, but on the flow of funds and services between health plan

---

[78] Neeraj Sood et al., *Flow of Money Through the Pharmaceutical Distribution System*, USC Schaeffer Ctr. for Health Pol'y & Econ. (June 6, 2017), https://healthpolicy.usc.edu/research/flow-of-money-through-the-pharmaceutical-distribution-system/.

payors, such as Plaintiff, the pharmacy benefit managers, and the pharmaceutical manufacturers. Here, the complex chain generally works as follows: (1) the pharmacy benefit managers negotiate with the drug manufacturers to receive discounts from list prices, rebates, and other fees in exchange for preferred placement on their plan formularies; (2) the pharmacy benefit managers manage the drug benefits for the health plan payors, such as Plaintiff; (3) the health plan payors pay their pharmacy benefit managers for the prescription drugs purchased by their beneficiaries; and (4) the health plan payors, such as Plaintiff, receive an undisclosed percentage of the rebate amount negotiated between the pharmacy benefit managers and manufacturers from their pharmacy benefit managers.

### 1.    The Rise of PBMs in the Pharmaceutical Supply Chain

161.   When they first came into existence in the late 1960s, pharmacy benefit managers provided administrative services to health plans by processing claims and maintaining formularies. Over time, they began to play a larger role, including negotiating prices with drug manufacturers. Since pharmacy benefit managers were independent, they generally were thought to pass savings back to health plans and consumers by using their leverage to negotiate lower

reimbursement rates with pharmacies and discounts with drug manufacturers.[79]

162.   In the 1990s, drug manufacturers began acquiring pharmacy benefit managers, which caused an "egregious conflict[] of interest," prompting the Federal Trade Commission to undo those deals. The deals allowed drug manufacturers to "coordinate pricing policies, see their competitors' sensitive pricing information, and favor their own drugs over those of their competitors."[80]

163.   In the early and late 2000s, pharmacy benefit managers started buying pharmacies, which has caused a similar conflict of interest that resulted from the merger of drug manufacturers and pharmacy benefit managers in the 1990s. When a pharmacy benefit manager combines with a pharmacy, they "lose the incentive to police against pharmaceutical company schemes to steer patients to more expensive drugs. Indeed, they may collude in them."[81] The power of the largest pharmacy benefit managers has continued to grow, allowing them to distort the pharmaceutical supply chain to their own financial advantage.

---

[79] Brian Feldman, *Big pharmacies are dismantling the industry that keeps US drug costs even sort-of under control*, Quartz (Mar. 17, 2016), https://qz.com/636823/big-pharmacies-are-dismantling-the-industry-that-keeps-us-drug-costs-even-sort-of-under-control/.
[80] *Id.*
[81] *Id.*

## 2. The Current Size and Role of PBMs in the Pharmaceutical Supply Chain

164. According to the Pharmaceutical Care Management Association, the trade group that represents the PBM industry, pharmacy benefit managers manage pharmacy benefits for over 275 million Americans.[82] Three large companies dominate the PBM market: Express Scripts, CVS Caremark, and OptumRx.

165. These PBM Defendants provide services to plans that administer prescription drug benefits to more than 275 million Americans and process more than 3 billion claims per year, and the PBM Defendants earn an enormous amount of revenue from the services described above.

166. Express Scripts is the largest PBM in the United States.[83] In 2022, annual revenue for Express Scripts' parent, Cigna Corp., was approximately $180.5 billion.[84] As of December 31, 2022, more than 67,000 retail pharmacies participated in one or more of Express Scripts' networks.[85]

---

[82] *About PCMA*, Pharm. Care Mgmt. Ass'n, https://www.pcmanet.org/about (last visited Dec. 27, 2024).
[83] Anne Steele, *Express Scripts Revenue Falls*, Wall St. J. (Feb. 14, 2017), https://www.wsj.com/articles/express-scripts-revenue-falls-1487108990.
[84] The Cigna Group Annual Report, *supra* n.30.
[85] *Id.*

167.    Insulin is a substantial part of Express Scripts' business. Indeed, Express Scripts reported that diabetes was the second-highest therapeutic class of drugs in terms of patient spending in both 2021 and 2022.[86]

168.    In 2022, Defendant CVS Health's annual revenue was approximately $322.5 billion.[87] Its pharmacy services segment, which includes the corporation's PBM activities but not its retail/long-term care segment, brought in $169.2 billion in net revenues in 2022.[88] And CVS Health's health services business, which includes its PBM CVS Caremark, saw revenue of $90.8 billion for the first half of 2023 alone, up 8.9% from the same period in 2022.[89]

169.    CVS Health, through its subsidiary PBM, provides pharmacy benefit administration for a network of more than 66,000 retail pharmacies, including approximately 40,000 chain pharmacies and 26,000 independent pharmacies.[90]

---

[86] *Express Scripts Canada, 2023 Drug Trend Report*, https://www.express-scripts.ca/sites/default/files/2023-04/ESC%20DTR%20EN%20April%205%202023%20final.pdf (last visited Dec. 27, 2024).
[87] CVS Health Corp., Annual Report (Form 10-K) (Feb. 8, 2023) at 73.
[88] *Id* at 81.
[89] Denise Myshko, *CVS's Health Services Business Grows 9% in First Half of 2023*, Formulary Watch (Aug. 3, 2023), https://www.formularywatch.com/view/cvs-s-health-services-business-grows-9-first-half-of-2023.
[90] CVS Health Corp., Annual Report, *supra* n.87 at 9.

CVS Health's PBM filled or managed approximately 2.3 billion prescriptions during the year ending on December 31, 2022.[91]

170.   The third largest PBM, OptumRx, is owned by UnitedHealth and provides pharmacy care services through a network of more than 67,000 retail pharmacies and multiple delivery facilities. In 2022, UnitedHealth Group's total revenue was $324.2 billion.[92] In 2022, total revenue for OptumRx alone was $99.8 billion.[93]

171.   In 2022, OptumRx managed more than $124 billion in pharmaceutical spending,[94] and fulfilled 1.438 billion adjusted scripts.[95]

172.   As described above, the PBM Defendants also control the market nationally. In particular, as recently as 2021, PBM Defendants make up nearly 80% of the market in terms of total prescription claims managed.[96]

---

[91] *Id.* at 8.
[92] UnitedHealth Group, Annual Report (Form 10-K) (Feb. 24, 2023) at 29.
[93] *Id.* at 30.
[94] *Id.*
[95] *Id.* at 32.
[96] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2021: The Big Get Even Bigger*, Drug Channels (Apr. 5, 2022), https://www.drugchannels.net/2022/04/the-top-pharmacy-benefit-managers-of.html.



PBM Market Share, By Total Equivalent Prescription Claims Managed, 2021

173.    The PBM Defendants' total earnings come directly from the pockets of payors, including payors such as M-NCPPC, which cover the ever-increasing costs of insulin for their Beneficiaries.

174.    Due to the PBM Defendants' market share, smaller pharmacy benefit managers and other health insurers have significantly less bargaining power with drug manufacturers.

175.    Recognizing this disadvantage, smaller pharmacy benefit managers have partnered with the major PBM Defendants, delegating responsibility for rebate negotiations with drug manufacturers to the major PBM Defendants.

176.    On December 19, 2019, Express Scripts entered into a three-year collaboration agreement with Prime Therapeutics LLC ("Prime Therapeutics"), under which Express Scripts would provide Prime Therapeutics services related to pharmaceutical manufacturer contracts. This agreement was renewed as of July 5, 2023. Under this agreement, Express Scripts handles negotiations for pharmacy

benefit drugs, including the at-issue drugs, with the Manufacturer Defendants and retail pharmacy network contracting for most of Prime Therapeutics' business.

177.   Due to the collaboration with Prime Therapeutics, Express Scripts now provides pharmacy benefit services to an additional 28 million individuals. As a result, Express Scripts has gained substantial additional bargaining leverage in the marketplace.

178.   Earlier in 2019, prior to entering into a collaboration agreement with Prime Therapeutics, Express Scripts formed Ascent, a group purchasing organization. Express Scripts later invited Prime Therapeutics into Ascent's ownership. Under Express Scripts and Prime Therapeutic's collaboration, rebate negotiations with manufacturers for a number of pharmacy benefit drugs were to be handled by Ascent.

179.   The partnership between Express Scripts and Prime Therapeutics has come under scrutiny. The 2021 Grassley-Wyden Senate Report on the rising cost of insulin wrote that "it is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent[.]"[97]

---

[97] U.S. S. Fin. Comm., *supra* n.9, at 83.

180.   Although Prime Therapeutics and Express Scripts touted their new partnership as a means to deliver "more affordable health care," in reality, their partnership has enabled both Express Scripts and Prime Therapeutics to profit off of increased rebates that are not passed on to the consumer, while further escalating the already artificially high cost of insulin.

### 3.   The Close Relationship Between the PBM Defendants and Manufacturer Defendants

181.   The Insulin Pricing Scheme relies on close negotiations and communications between the PBM Defendants and Manufacturer Defendants. The pharmaceutical industry, being especially insular in nature, has provided both the Manufacturer Defendants and the PBM Defendants opportunities for contact and communication with their direct competitors, in addition to negotiations and communications between the PBM and Manufacturer Defendants.

182.   All Manufacturer Defendants are members of the Pharmaceutical Research and Manufacturers of America ("PhRMA"). Each Manufacturer Defendant routinely interacts and communicates with the other Manufacturer Defendants through PhRMA meetings and platforms. David Ricks, CEO of Eli Lilly, Paul Hudson, CEO of Sanofi, and Douglas Langa, President of Novo Nordisk, all serve on the PhRMA Board of Directors.

183.   All PBM Defendants are members of the Pharmaceutical Care Management Association ("PCMA").

184.    David Joyner, Executive Vice President of CVS Health and President of CVS Caremark, Patrick Conway, CEO of OptumRx, Adam Kautzner, President of Express Scripts, and Mostafa Kamal, President and CEO of Prime Therapeutics, all serve on the PCMA Board of Directors.

185.    The PBM Defendants regularly interact with the Manufacturer Defendants at trade associations and conferences. For example, the PCMA Annual Meeting's website states that the conference is "tailored specifically for senior executives from PBMs and their affiliated business partners – most notable drug manufacturers."[98] These conferences provide prime opportunities for PBM members and drug manufacturers to interact. Indeed, these conferences specifically advertise the opportunities for members to have conversations in private meeting rooms.[99]

186.    Not only are the Manufacturer Defendants attendees at the PCMA conferences, but they are also sponsors. Novo Nordisk is listed as a 2023 Partner Sponsor for the PCMA Annual Meeting, Eli Lilly is listed as an Executive Sponsor, and Sanofi is listed as a Presidential Sponsor.[100]

---

[98] PCMA Annual Meeting 2021, https://www.pcmanet.org/events/past-events/pcma-annual-meeting-2021/ (last visited Dec. 27, 2024).
[99] *Id.*
[100] *Sponsors*, PCMA Annual Meeting 2023, https://web.archive.org/web/20230926120140/https://www.pcmanet.org/pcma-event/annual-meeting-2023/ (last visited Dec. 27, 2024).

187.   Through these conferences and other communications, the PBM Defendants and the Manufacturer Defendants are free to secretly discuss rebates, administrative fee arrangements, and the like, to artificially inflate the price of insulin while pocketing substantial sums of money.

188.   Notably, at-issue lockstep price increases for insulin occurred shortly following PCMA meetings. For example, on May 30, 2014, a few weeks following a Spring 2014 PCMA conference, Novo Nordisk raised the list price of Levemir mere hours after Sanofi increased the list price of Lantus.

189.   On September 26 and 27, 2017, the PCMA held its annual meeting. On October 1, 2017, Sanofi increased the list price of Lantus by 3% and the list price of Toujeo by 5.4%. Shortly after the PCMA meeting, Novo Nordisk also recommended a 4% increase in the list price of their insulin drugs, effective January 1, 2018.

190.   Given the enormous size of the PBM Defendants and their omnipresent role in the pharmaceutical supply chain, it is crucial that the PBM Defendants avoid conflicts of interest and deal fairly with customers, a fact expressly recognized by Defendants Express Scripts, UnitedHealth Group, and CVS Health.

191.   Defendant Express Scripts has a published Code of Conduct, which emphasizes the importance in avoiding conflicts of interest.[101]

192.   UnitedHealth Group, which owns PBM Defendant OptumRx, has a published Code of Conduct that stresses the importance of fair dealing, stating that "each employee, director and contractor must deal fairly with the Company's customers, service providers, suppliers, competitors and employees."[102] The Code of Conduct further states that "[n]o employee or director should take unfair advantage of anyone through unfair-dealing practices."[103]

193.   Defendant CVS Health also has a published Code of Conduct, which emphasizes the importance of fair dealing.[104] CVS Health's Code of Conduct states that it "will deal fairly with our customers, members, providers, clients, suppliers, regulators, shareholders and others around the world with whom we do business."[105] The Code of Conduct further states that CVS Health "refuse[s] to participate in any conduct or sales or other practice that is intended to mislead,

---

[101] *Code of Conduct*, Express Scripts, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Dec. 27, 2024).
[102] *Code of Conduct*: *Our Principles of Ethics and Integrity*, UnitedHealth Grp., at 15 (2018), https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/resources/FWA_CoCs_2018.pdf.
[103] *Id.*
[104] *Code of Conduct*, CVS Health (Mar. 2024), https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/cvs-health-code-of-conduct.pdf.
[105] *Id* at 23.

Complaint- 71

manipulate or take unfair advantage of anyone, or misrepresent products, services, contract terms or policies to anyone."[106]

## D.    The Insulin Pricing Scheme

194.   The Insulin Pricing Scheme describes the coordinated unfair and deceptive conduct of the three largest PBMs (CVS Health, Express Scripts, and OptumRx) and the three largest insulin manufactures (Eli Lilly, Novo Nordisk, and Sanofi) to artificially inflate the cost of insulin, analog insulins, and related diabetes medications. As a result of the Insulin Pricing Scheme, the PBM Defendants, in exchange for including the Manufacturer Defendants' drugs in premium placements on their formulary lists, receive higher rebates along with other payments from the Manufacturer Defendants. The PBM and Manufacturer Defendants conspired to prevent disclosures of the drugs' net prices to payors and consumers, including Plaintiff, leading to outsize profits for Defendants because of the inflated list prices resulting from the Insulin Pricing Scheme.

195.   The Insulin Pricing Scheme is evidenced by the astronomic increase in the price of insulin, the Manufacturer Defendants' lockstep increases in insulin prices, the growing gap between the list price of insulin and the net price realized by the Manufacturer Defendants, and the massive profits the PBM Defendants

---

[106] *Id.*

receive as a result of the negotiated drug rebates and fees paid to them by the Manufacturer Defendants in exchange for favorable formulary placement.

196. As a direct and proximate cause of Defendants' Insulin Pricing Scheme, payors like M-NCPPC are overpaying for life-saving medications.

### 1. Insulin's Price Has Risen Dramatically.

197. The prices of the at-issue drugs have increased dramatically. For example, since 2003, the list price of certain insulins has increased by more than 500%—an astounding increase, especially when compared to a general inflation rate of 8.3% and a "medical inflation [rate] of 46% in this same time period."[107]

198. According to a report by Business Insider, similar price increases can be identified across insulin products and across manufacturers: a version of insulin that carried a list price of $93 per vial in 2009 was priced at close to $275 per vial in September 2019. Another type of insulin that cost only $93 per vial in 2009 cost nearly $290 per vial in September 2019.[108] The prices of insulin have increased especially sharply in the past two decades. According to a report published by the American Journal of Managed Care, in 1996, when Eli Lilly launched its insulin

---

[107] Hirsch, *supra* n.34, at 1.
[108] Rachel Gillett & Shayanne Gal, *One chart reveals how the cost of insulin has skyrocketed in the US, even though nothing about it has changed*, Bus. Insider (Sept. 18, 2019), https://www.businessinsider.com/insulin-price-increased-last-decade-chart-2019-9.

analog Humalog, the price an individual would need to pay for a vial was $21.[109]

In 2001, this same vial cost an individual $35, and in 2019, that vial cost

approximately $275—a 1200% increase from its original price.[110]

199.   Since 2004, analog insulins from the Manufacturer Defendants have

more than quadrupled in price, as shown below:[111]

Comparison of Insulin Price Increases—Lantus, Humalog, Novolog, and Levemir, 2004–2022



200.   These price increases have occurred even in the face of supposed

competition between manufacturers making similar drugs. Since the mid-1990s,

there have been more than two dozen price increases on a vial of Humalog

insulin.[112]

---

[109] Danielle K. Roberts, *The Deadly Costs of Insulin*, Am. J. Managed Care (June 10, 2019), https://www.ajmc.com/view/the-deadly-costs-of-insulin.
[110] *Id.*
[111] Newton, *supra* n.20.
[112] Johnson, *supra* n.54.

201.  The Manufacturer Defendants have represented that the price of the at-issue insulin drugs is determined, in part, by the need to fund research, development, and innovation. And the PBM Defendants have continually claimed that they intentionally work to reduce insulin prices. For example:

A.   In 2010, CVS Caremark represented that it was focused on "improv[ing] health care outcomes for diabetes patients" and helping "customers with diabetes, or caring for someone with the disease, to manage these rising health care costs," noting that "a [PBM] client with 50,000 employees whose workforce has an average prevalence of diabetes could save roughly $3.3 million a year[.]"[113]

B.   In the same year, Andrew Sussman, CVS Caremark's Chief Medical Officer, stated that CVS was "working to develop programs to hold down [diabetes] costs."[114]

202.  In 2016, the SVP and Chief Innovation Officer at Express Scripts stated that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease," and that it

---

[113] *CVS Expands ExtraCare for Diabetes Products*, Chain Drug Rev. (May 11, 2010), https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/.
[114] *Diabetes Epidemic Growing*, CBS News (June 22, 2010), https://www.cbsnews.com/news/diabetes-epidemic-growing/.

"broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[115]

203.   Despite this, in December 2021, the U.S. House of Representatives Committee on Oversight and Reform concluded in its Drug Pricing Investigation that these claims were unsupported.[116]

204.   Driven by these price hikes, patient and health plan payor spending on insulin has skyrocketed, with totals in the tens of billions of dollars.

**2.    Insulin List Prices Have Increased in Lockstep.**

205.   These price increases are even more troubling when one considers their timing and context, which seem to bear little relation to developmental advances or market demand. For example, as indicated below, between 2006 and 2019, prices for two competing long-acting analog insulin products—Sanofi's Lantus and Novo Nordisk's Levemir—went up in lockstep.[117]

---

[115] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year,* Wall St. J. (Nov. 8, 2012), https://www.wsj.com/articles/SB10001424127887324439804578107040729812454; Angela Mueller, *Express Scripts launches program to control diabetes costs*, St. Louis Bus. J. (Aug. 31, 2016), https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html.

[116] U.S. H.R., Comm. on Oversight & Reform, *Drug Pricing Investigation* (Dec. 2021), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf.

[117] U.S. H.R., Comm. on Oversight & Reform, *supra* n.116; *see also* Langreth, *supra* n.20.





206. Similarly, the price of Humalog, a rapid-acting analog insulin produced by Eli Lilly, and the price of its direct competitor, Novolog, produced by Novo Nordisk, increased in lockstep from 2001 through 2018.[118]

---

[118] U.S. H.R., Comm. on Oversight & Reform, *supra* n.116.



**Comparison of Rapid-Acting-Insulin Price Increases—**
**Humalog (Eli Lilly) and Novolog (Novo Nordisk), 1996–2018**

207. This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing"[119] and, as noted by Dr. Irl B. Hirsch, has functioned to precipitously increase the price of insulin in the United States.[120]

208. The overlap in price hikes across both categories of analog insulins (rapid and long-acting) is remarkable as well:[121]

---

[119] Lydia Ramsey Pflanzer, *There's something odd about the way insulin prices change*, Bus. Insider (Sept. 17, 2016), https://www.businessinsider.com/rising-insulin-prices-track-competitors-closely-2016-9.

[120] Hirsch, *supra* n.34.

[121] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.



209.   In thirteen instances since 2009, Sanofi and Novo Nordisk raised the list prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other."[122] As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you."[123] Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog.

210.   Because of Defendants' Insulin Pricing Scheme and the lockstep increases in the price of insulin, "[n]early a century after its discovery, there is still no inexpensive supply of insulin for people living with diabetes in North

---

[122] Langreth, *supra* n.20.
[123] *Id.*

America[.]"[124] Instead, diabetes patients who need insulin to survive are forced to pay exorbitant costs to survive.

### 3.    The Growing Gap Between List Prices and Net Prices

211.    The Insulin Pricing Scheme is further evidenced by the growing gap between the list price of insulin drugs and net price realized by the Manufacturer Defendants once all rebates and fees paid to the PBM Defendants are taken into account.

212.    While the Defendants often obscure their true net realized prices for insulin, the escalating list price is generally public information. Defendants know that the public list prices do not bear a reasonable relationship to the profits and actual net prices realized by Defendants, and that payors, including M-NCPPC, made payments for insulin based on the false list prices generated by the scheme.

213.    As noted above, the list prices for analog insulins sold by Eli Lilly, Novo Nordisk, and Sanofi have increased rapidly in lockstep with one another. The question, then, is why the Manufacturer Defendants are not competing on price. They sell similar, and in many ways interchangeable drugs, and have been for years. Indeed, the drugs are the same as they were ten years ago, and the clinical benefit of the drugs remains unchanged. Yet, the list price keeps going up.

---

[124] Greene & Riggs, *supra* n.67, at 1175.

214.    The answer is the Insulin Pricing Scheme. The Manufacturer Defendants are not competing on price because, instead, they are competing on rebates and other fees paid to the PBM Defendants. This unfair and deceptive conspiracy explains the spectacular rise in list prices for the at-issue drugs, while the Manufacturer Defendants' net prices remain relatively constant—though of course the volume of sales and the amount of drugs they are able to sell and provide on formularies remains high. Indeed, as set forth herein, throughout the relevant time period, some of the at-issue drugs were among the most expensive M-NCPPC paid for, by gross cost.

215.    In exchange for the rebates and fees paid to the PBM Defendants, the PBM Defendants provide the Manufacturer Defendants with favorable formulary placement for their drugs. As explained by David Kliff, editor of the website Diabetic Investor, "Insulin is a commodity, so formulary position is everything. It's like location in real estate."[125] The Manufacturer Defendants are thus incentivized to participate in the Insulin Pricing Scheme because this favorable formulary placement results in increased sales and revenue of their at-issue insulin drugs.

---

[125] Arthur Allen, *Insulin's High Costs Goes Beyond Drugmakers to Industry's Price Mediators*, CNN (Mar. 9, 2023), https://www.cnn.com/2023/03/09/health/insulin-cost-khn-partner/index.html.

Complaint- 81

216.    The following figures, provided by Sanofi and Eli Lilly, illustrate the growing gap between list price and net price.[126]



Comparison of List and Net Price (Sanofi Insulin), 2010–2019

---

[126] Denise Roland, *Sanofi, Fighting Back in Insulin Price Debate, Says Its Net Prices Fell 11%*, Wall St. J. (Mar. 4, 2020), https://www.wsj.com/articles/sanofi-fighting-back-in-insulin-price-debate-says-its-net-prices-fell-11-11583340721 (Figure 1); Peter Loftus, *As Political Scrutiny Mounts, Eli Lilly Divulges New Insulin Pricing Data*, Wall St. J. (Mar. 24, 2019), https://www.wsj.com/articles/as-political-scrutiny-mounts-eli-lilly-divulges-new-insulin-pricing-data-11553436000 (Figure 2).



Comparison of List and Net Price Humalog (Eli Lilly), 2014–2018

217.   The below figure demonstrates the difference between the list price and net price of Sanofi insulins from 2012 to 2022.[127]



Comparison of List and Net Price (Sanofi Insulin), 2012-2022

---

[127] Prescription Medicine Pricing: Our principles and perspectives, Sanofi, https://web.archive.org/web/20230327030218/https://www.sanofi.us/dam/jcr:356cc1f5-92dd-47a1-9770-ba60dfdfab1e/Sanofi-2023-Pricing-Principles-Report.pdf (last visited Dec. 27, 2024).

218.   As indicated in the below diagrams prepared by SSR Health,[128] a health-industry research firm, the same widening gap between net price and list price has occurred for the other major analog insulins:



219.   The Manufacturer Defendants have publicly represented that these price increases are related to the drugs' value to the healthcare system and the need to fund research and development. For example, "briefing materials prepared for [Eli Lilly's] Chief Executive Officer (CEO) Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included 'Reactive Key Messages' on pricing that emphasized the significant research and development costs for insulin."[129]

---

[128] Robert Langreth et al., *Decoding Big Pharma's Secret Drug Pricing Practices*, Bloomberg (June 29, 2016), https://www.bloomberg.com/graphics/2016-drug-prices/.
[129] U.S. H.R., Comm. on Oversight & Reform, *supra* n.116, at 169.

Executives for other insulin manufacturers similarly represented that research and development costs were key factors driving the price increases for insulin.[130]

220.   Despite these representations, the Manufacturer Defendants' price increases far exceeded any related research and development costs. Eli Lilly, as mentioned above, reported that it spent approximately $680 million on research and development related to Humalog globally between 2005 and 2018; over that same period, worldwide net sales of Humalog were $31.35 billion—forty-six times more than reported research and development costs.[131] Similarly, Sanofi spent 2.4% of its U.S. net sales generated by Lantus on research and development.[132]

### 4.    Rebates Gone Awry

221.   The PBM Defendants turn a profit in numerous ways. Their health plan clients pay service fees for processing prescriptions and operating mail-order pharmacies. Health plans also pay transaction fees on the different operations required to manage the complex cash flows between insurers, pharmacists, and manufacturers. But one of the primary sources of PBM Defendants' profits in recent decades has been the drug "rebates" and other fees they negotiate with drug companies.

---

[130] *Id.* at 171.
[131] *Id.* at 169.
[132] *Id.* at 171.

222.   If the PBM Defendants operated ethically and honestly, they would negotiate lower drug prices in exchange for formulary access.[133] Indeed, pharmacy benefit managers have the greatest leverage to negotiate lower prices when two or more drug companies make ostensibly interchangeable products—i.e., drugs within the same therapeutic class. In such a scenario, the drug manufacturers should compete on price, as in normal competitive markets.

223.   The PBM Defendants acknowledge this leverage: CVS Health boldly boasts on its website that one of the "basic services" it provides is "negotiating low drug costs and rebates with pharmaceutical manufacturers."[134] Express Scripts says in its "About Us FAQ" that it "make[s] medication safer and more affordable."[135]

---

[133] Although the pharmacy benefit managers treat different insulin as if they were completely interchangeable, in fact, they have different inactive ingredients that can cause allergic reactions for diabetes patients. Type 1 diabetes is an autoimmune disease, and many patients are sensitive to insulin changes. Moreover, the treatment of different insulins as therapeutically interchangeable is also based on the assumption that all insulins are absorbed based on the same normal curve, which is not always true. Patients can have different duration of insulin action on one insulin versus another.

[134] *Pharmacy benefits management*, CVS Health,https://web.archive.org/web/20221209144208/https://www.cvshealth.com/services/prescription-drug-coverage/pharmacy-benefits-management.html (last visited Dec. 27, 2024).

[135] *About us*, Express Scripts, https://www.express-scripts.com/frequently-asked-questions/about (last visited Dec. 27, 2024).

And OptumRx says that it delivers "[a]ccess to affordable medications" and "transparent pricing and simplified pharmacy benefit[.]"[136]

224.  In addition to these general misrepresentations, the PBM Defendants have consistently and expressly disavowed that their conduct drives prices higher:

A.    In 2017, Express Scripts CEO Tim Wentworth stated that "[d]rugmakers set prices, and we exist to bring those prices down."[137]

B.    In the same year, CVS Caremark's Larry Merlo stated that "[a]ny suggestion that PBMs are causing prices to rise is simply erroneous."[138]

C.    OptumRx's Sumit Dutta, when asked by Congress if PBM-negotiated rebates and discounts were causing the price of insulin to

---

[136] *Pharmacy benefit management (PBM)*, Optum, https://www.optum.com/business/employers/pharmacy-care-services.html (last visited Dec. 27, 2024).

[137] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation'*, St. Louis Post-Dispatch (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html.

[138] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, The Hill (July 27, 2017), https://thehill.com/blogs/pundits-blog/healthcare/344115/who-is-to-blame-for-skyrocketing-drug-prices/.

increase, said that "we can't see a correlation [] when rebates raise list prices."[139]

D.    And in 2019, Amy Bricker—who worked for Express Scripts at the time before moving to CVS—testified, "I have no idea why list prices [for insulin] are high . . . it's not a result of rebates."[140]

225.    However, contrary to the PBM Defendants' representations, their arrangement with the Manufacturer Defendants is not operated ethically and honestly. The Manufacturer Defendants and PBM Defendants have realized that they both benefit if, instead of forcing the Manufacturer Defendants to sell their drugs for cheaper prices, the PBM Defendants induce the Manufacturer Defendants to "compete" by paying ever-increasing rebates and fees to the PBM Defendants. Because they are no longer competing on price, this arrangement induces the Manufacturer Defendants to raise their publicly-reported list prices, enabling them to largely maintain their net price—which equals a drug's list price minus all rebates, discounts, and fees. The increased list prices create what is, in effect, a massive slush fund that can be used by the Manufacturer Defendants to pay the

---

[139] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin, H. Comm. Hearing*, at 1021–1022 (Apr. 10, 2019), https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3; (preliminary transcript: https://www.congress.gov/116/meeting/house/109299/documents/HHRG-116-IF02-Transcript-20190410.pdf).
[140] *Id.* at 1016–1017.

ever-larger rebates and fees demanded by the PBM Defendants for formulary placement.[141]

226. The Insulin Pricing Scheme allows the Manufacturer Defendants to maintain their profit margins on drugs sold in the United States—which are higher than anywhere else in the world—and ensure their access to the millions of Americans who obtain the at-issue drugs via the PBM Defendants' formularies. And the Insulin Pricing Scheme allows the PBM Defendants to leverage their control over formularies to obtain kickbacks. With list prices going up, the rebates get bigger, and so does the PBM Defendants' cut. The Insulin Pricing Scheme artificially drives up list prices so the Manufacturer Defendants can earn more profit. And the Manufacturer Defendants can pay the PBM Defendants what they demand without significantly impacting their profits.

227. Thus, far from using their prodigious bargaining power to lower drug prices as they repeatedly claim, the PBM Defendants abuse their position to benefit both themselves and the Manufacturer Defendants. It is a profitable but deeply unethical enterprise that takes advantage of consumers and health plan payors, who do not pay the "net" price but instead pay amounts derived from the ever-increasing list price. Thus, while the PBM and Manufacturer Defendants benefit, it is consumers and health plans who shoulder the burden of the inflated list prices

[141] Roland & Loftus, *supra* n.28.

through increased payments. This dynamic lies at the heart of the surging cost of insulin.

228.   Drug manufacturers well understand the power of pharmacy benefit managers.[142] Because of their size, and the many thousands of health plan clients they serve, pharmacy benefit managers can steer business from one drug manufacturer to another based on which one pays the larger kickback.

229.   Pharmacy benefit managers make outsize profits by exploiting the United States' complex pharmaceutical distribution system. While the existence of pharmacy benefit managers in the supply chain is known, the nature and magnitude of the rebates and other fees they extract from drug companies for formulary placement, and the portion of these payments they pocket, are carefully guarded secrets.[143]

230.   Although the true amount of rebates received by the PBM Defendants is unknown, available data demonstrates an increase over time in the aggregate rebates made by Manufacturer Defendants Eli Lilly, Novo Nordisk and Sanofi to

---

[142] *Id.*

[143] *See*, *e.g.*, Lydia Ramsey, *One of the largest middlemen in the drug industry just released a video showing why it should be able to remain secretive*, Bus. Insider (Feb. 9, 2017), http://www.businessinsider.com/what-pharmacy-benefit-managers-are-doing-about-trump-and-drug-pricing-2017-2.

pharmacy benefit managers and insurers. This is illustrated in the chart below, which shows the growth in Novo Nordisk's aggregate rebates from 2007 to 2014.[144]



Reported Rebates as a Percentage of U.S. Gross Sales for Novo Nordisk, 2007–2014

Source: Company data, Credit Suisse estimates

231.    Sanofi has also greatly increased its rebates. The chart below shows the growth of Sanofi's rebate business from 2007 to 2014.

---

[144] Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).



Source: Company data, Credit Suisse estimates

232. Finally, Eli Lilly has greatly increased its rebates. The chart below shows Eli Lilly's rebate increase from 2007 to 2014. Contrary to Novo Nordisk, for which insulin represents a substantial amount of gross revenues, Eli Lilly is an extremely diversified manufacturer. As a result, the impact of the very steep insulin rebating that has gained Lilly the lion's share of the U.S. insulin market in recent years is attenuated in the graph below by less aggressive rebating in other drug classes.



Source: Company data, Credit Suisse estimates

5.      Clawbacks

233.    In addition to profiting off increasing rebates, the PBM Defendants

use clawbacks to profit from the Insulin Pricing Scheme.

234.    Non-PBM affiliated pharmacies state that pharmacy benefit managers

have forced them to sign contracts that include clawbacks or post-purchase

discount provisions, under which the pharmacies have to pay the pharmacy benefit

managers money, sometimes long after sales take place.[145] Mel Brodsky, the

Executive Director of the Philadelphia Association of Retail Druggists noted that

_____

[145] Arthur Allen, *What to know about the drug price fight in those TV ads*, NPR
(July 7, 2023), https://www.npr.org/sections/health-
shots/2023/07/07/1186317498/pharmacy-benefit-manager-pbm-ads-congress.

the contracts between pharmacies and pharmacy benefit managers are "usually take-it-or-leave-it contracts."[146]

235.   Clawbacks are typically a percentage of a drug's list price. Because the Insulin Pricing Scheme has artificially inflated the list price of insulin drugs, it creates greater clawbacks for the PBM Defendants.[147] This further adds to the already strong incentives for the PBM Defendants to aggressively pursue conduct that artificially inflates list prices.

### 6.    Spread Pricing

236.   Another way that the PBM Defendants profit from the Insulin Pricing Scheme is through spread pricing.

237.   The PBM Defendants determine which pharmacies they want to contract with and include in their networks. In these contractual agreements, the PBM Defendants determine how much they will reimburse pharmacies for drugs (typically a percentage of the list price).

238.   The PBM Defendants charge health plan payor clients more for a drug (a higher percentage of the list price) than the PBM Defendants pay the pharmacies. The PBM Defendants keep the difference. Because both the client and pharmacy

---

[146] Jared Hopkins, *Stop Overpaying for Medicine*, Readers Dig. (June 2018).
[147] Bob Herman, *How drug middlemen take back money from pharmacies,* Axios (July 25, 2019), https://www.axios.com/2019/07/25/express-scripts-pharmacies-quality-clawbacks-contract.

contracts are structured as a percentage of the list price, the amount of "spread" the PBM Defendants retain increases as the list price increases, thus further adding to the PBM Defendants' incentives to artificially increase list prices.

239.    In 2022, the Pharmacy Benefit Manager Transparency Act—S. 4293—was introduced to prohibit spread pricing: when a pharmacy benefit manager "[charges] a health plan or payer a different amount for a prescription drug's ingredient cost or dispensing fee than the amount the pharmacy benefit manager reimburses a pharmacy for the prescription drug's ingredient cost or dispensing fee where the pharmacy benefit manager retains the amount of any such difference."[148] The bill was not enacted into law.

240.    The PBM Defendants also benefit from a related concept when health plan members fill prescriptions through the PBM Defendant's affiliated retail and mail-order pharmacies. The PBM Defendants' in-house pharmacies acquire drugs at a lower cost than what the PBM Defendants charge their health plan payor clients. The PBM Defendants (together with their affiliated pharmacies) thus profit off the spread between their acquisition costs and the amounts paid by health plan payors.

---

[148] Pharmacy Benefit Manager Transparency Act of 2022, S. 4293, 117th Cong., §2(a)(1), https://www.govtrack.us/congress/bills/117/s4293 (last visited Dec. 27, 2024).

241.   The size of this spread is further increased by various discounts the PBM Defendants and their affiliated pharmacies negotiate with the Manufacturer Defendants. Moreover, the PBM Defendants' negotiations with the Manufacturer Defendants may give them inside information as to when the Manufacturer Defendants will increase list prices, allowing the PBM Defendants (and their affiliated pharmacies) to maximize their spread income by stockpiling drugs before price increases and then later selling them to health plan members and payors at the increased price.

### 7.   Defendants' Admissions

242.   Defendants have acknowledged these price increases of insulin and their impact on payors and patients. On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on industry practices titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."

243.   Representatives from all Defendants testified at the hearing and admitted that the price for insulin had increased exponentially over the past fifteen years.

244.   Each Defendant also conceded that the price that diabetics pay out-of-pocket for insulin is too high. For example:

A.     Dr. Sumit Dutta, SVP and Chief Medical Officer of OptumRx since 2015, stated that "[a] lack of meaningful competition allows [M]anufacturers to set high list prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."[149]

B.     Thomas Moriarty, General Counsel for CVS Health, admitted that "[a] real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, list prices for insulin have increased nearly 50 percent. And over the last 10 years, list price of one product, Lantus, rose by 184 percent."[150]

C.     Mike Mason, Senior Vice President of Eli Lilly, when discussing how much diabetics pay out-of-pocket for insulin, stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications."[151]

---

[149] *Priced Out of a Lifesaving Drug*, *supra*, n.139, at 919–24.
[150] *Id.* at 705–10.
[151] *Id.* at 461–63.

D.    Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified "[p]atients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is clearly failing too many people . . . we recognize the need to address the very real challenges of affordability . . . since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients[.]"[152]

E.    Doug Langa, Executive Vice President of Novo Nordisk, stated "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the list prices of our medicines. We also know that list price matters to many, particularly those in a high-deductible health plan and those that are uninsured."[153]

245.    Notably, none of the testifying Defendants blamed the significant increase in the price of insulin to competitive factors such as increased production costs or improved clinical benefit.

246.    Instead, Novo Nordisk's President Doug Langa's written testimony for the April 2019 hearing recognized "misaligned incentives" that have led to higher drug costs, including for insulin: "Chief among these misaligned incentives

---

[152] *Id.* at 616–18, 643–44, 657–59.
[153] *Id.* at 531–35.

is the fact that the rebates pharmaceutical companies pay to PBMs are calculated as a percentage of WAC [list] price. That means a pharmaceutical company fighting to remain on formulary is constrained from lowering WAC price, or even keeping the price constant, if a competitor takes an increase. This is because PBMs will then earn less in rebates and potentially choose to place a competitor's higher-priced product on their formulary to the exclusion of others."[154] Likewise, Mr. Langa's responses to questions for the record conceded that "[t]he disadvantage of a system in which administrative fees are paid as a percentage of list price is that there is increased pressure to keep list prices high[.]"[155]

247.   The hearing transcript records Mr. Langa's further comments in this regard:

> [T]here is this perverse incentive and misaligned incentives and this encouragement to keep list prices high. And we've been participating in that system because the higher the list price, the higher the rebate … There's a significant demand for rebates. . . . we're spending almost $18 billion a year in rebates, discount, and fees, and we have people with insurance with diabetes that don't get the benefit of that.[156]

---

[154] Testimony of Douglas J. Langa, Novo Nordisk, H.R. Comm. on Energy & Com., at 3 (Apr. 10, 2019), https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Wstate-LangaD-20190410.pdf.

[155] Douglas J. Langa, Novo Nordisk, Resps. to Questions for the Record, H.R. Comm. on Energy & Com, at 9 (Apr. 10, 2019), https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Bio-LangaD-20190410-U2.pdf.

[156] *Priced Out of a Lifesaving Drug*, *supra*, n.139, at 988–91, 994, 1103–05.

248.  Eli Lilly admitted that it raises list prices as a quid pro quo for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> Seventy-five percent of our list price is paid for rebates and discounts … $210 of a vial of Humalog is paid for discounts and rebates. . . . We have to provide rebates [to PBMs] in order to provide and compete for that [formulary position] so people can use our insulin.[157]

In the very next question, Mr. Langa of Novo Nordisk was asked, "[H]ave you ever lowered a list price? His answer, "We have not."[158]

249.  Sanofi's Executive Vice President for External Affairs, Kathleen Tregoning, testified: "The rebates is [sic] how the system has evolved. . . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient."[159] Her written response to questions for the record acknowledged that "it is clear that payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product than for the lower list price product."[160]

---

[157] *Id*. at 979–80, 984–85, 1201–02.
[158] *Id*. at 1203–05.
[159] *Id*. at 1123, 2409–12.
[160] Kathleen Tregoning, Sanofi, Resps. to Questions for the Record, H.R. Comm. on Energy & Com, at 20 (Apr. 10, 2019), https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Bio-TregoningK-20190410-U2.pdf.

250.   The PBM Defendants also conceded at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

251.   In her responses to questions for the record, Amy Bricker—former President of Express Scripts, a former PCMA board member, and now an executive at CVS Health—confirmed that "manufacturers lowering their list prices" would give patients "greater access to medications;"[161] yet when asked to explain why Express Scripts did not grant an insulin with a lower list price preferred formulary status, answered, "Manufacturers do give higher discounts [i.e., payments] for exclusive [formulary] position . . ." When asked why the PBM would not include both costly and lower-priced insulin medications on its formulary, Ms. Bricker stated plainly, "[w]e'll receive less discount in the event that we do that."[162]

252.   As Dr. Dutta, SVP of OptumRx, perversely reasoned, the cheaper list-priced alternative Admelog is not given preference on the formulary because "it would cost the payer more money to do that . . . [b]ecause the list price is not what the payer is paying. They're paying the net price."[163] But, of course, health plan payors do not pay the "net" price, even when "rebates" are passed-through, because

---

[161] Amy Bricker, Express Scripts, Resps. to Questions for the Record, H.R. Comm. on Energy & Com, at 8 (Apr. 10, 2019),
[162] *Priced Out of a Lifesaving Drug*, *supra*, n.139, at 1345–46, 1354–55.
[163] *Id*. at 1392, 1394–95.

the PBMs receive and retain countless other forms of payments that drive up the gap between the "list" price and the "net" price retained by drug manufacturers.

253.  While all Defendants acknowledged before Congress their participation in conduct integral to the Insulin Pricing Scheme, none revealed its inner workings or the connection between their coordination and the economic harm that payors and beneficiaries were unwittingly suffering. Instead, in an effort to obscure the true reason for precipitous price increases, each Defendant group pointed the finger at the other as the more responsible party.

254.  The PBM Defendants testified to Congress that the Manufacturer Defendants are solely responsible for their list price increases and that the Manufacturer Payments that the PBM Defendants receive are not correlated to rising insulin prices.

255.  On the contrary, the amount the Manufacturer Defendants kick back to the PBM Defendants is directly correlated to an increase in list prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in list price.[164] Reducing or eliminating Manufacturer Payments would lower prices and reduce health plan expenditures for payors and beneficiaries.

---

[164] Neeraj Sood et al., *The Association Between Drug Rebates and List Prices*, USC Schaeffer Ctr. for Health Pol'y & Econ. (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/.

256.   Further, in large part because of the increased list prices and related Manufacturer Payments, the PBM Defendants' profit per prescription has grown substantially over the same period that insulin prices have steadily increased. For example, since 2003, Defendant Express Scripts has seen its profit per prescription increase more than 500% per adjusted prescription.[165]

257.   Novo Nordisk's President Doug Langa submitted written testimony to Congress acknowledging "there is no doubt that the WAC [list] price is a significant component" of "what patients ultimately pay at the pharmacy counter[.]"[166] Yet, the Manufacturer Defendants urged upon Congress the fiction that the pharmacy benefit managers were solely to blame for insulin prices because of their demands for rebates in exchange for formulary placement. The Manufacturers claimed their hands were tied and sought to conceal their misconduct by suggesting that they have not profited from rising insulin prices.

258.   Given the Manufacturers' claims that rebates were the sole reason for rising prices, each was asked directly during the Congressional hearing to guarantee it would decrease list prices if rebates were restricted or eliminated. The

---

[165] David Balto, *How PBMs Make the Drug Price Problem Worse*, The Hill (Aug. 31, 2016), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse/.
[166] Testimony of Douglas J. Langa, *supra*, n.154, at 3.

spokespersons for Eli Lilly, Novo Nordisk, and Sanofi all said only that they would "consider it."

259.    In January 2021, the Senate Finance Committee (Grassley-Wyden) issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" that detailed Congress's findings after reviewing more than 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna. The report concluded, among other things:

A.    The Manufacturer Defendants retain more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

B.    the Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and

C.    the Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014–2018 during which time the company generated $22.4 billion in revenue on these drugs.

260.   The 2021 Senate Finance Committee Report summed up the benefit to the Manufacturer Defendants, finding that "drug manufacturers increased insulin WAC [wholesale cost], in part to give them room to offer larger rebates to PBM and health insurers, all in the hopes that their product would receive preferred formulary placement. This pricing strategy translated into higher sales volumes and revenue for manufacturers."[167]

261.   Under the Insulin Pricing Scheme, the Manufacturer Defendants pay the PBM Defendants opaque but significant Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues and steady profit margins. The PBM Defendants grant national formulary position to at-issue drugs in exchange for large Manufacturer Payments generated by inflated drug prices.

262.   Inflated list prices also reap the manufacturers hundreds of millions of dollars in tax breaks because they can base their deductions for insulin donations on the inflated list prices.

263.   Because of the increased list prices and related Manufacturer Payments, the PBM Defendants' profit per prescription has grown exponentially during the relevant period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to

---

[167] U.S. S. Fin. Comm., *supra* n.9.

the PBM Defendants for each insulin prescription increased more than 150% from 2014 to 2018.[168] In fact, for transactions in which the PBM Defendants control the PBM and the pharmacy (e.g., Caremark-CVS pharmacy), these Defendants were capturing an astonishing 40% of the money spent on each insulin prescription (up from 25% just four years earlier), even though they do not contribute to the development, manufacture, innovation, or production of the product.

264.   As detailed above, the PBM Defendants profit from the artificially inflated prices created by the Insulin Pricing Scheme in several ways, including: (1) retaining a significant, yet undisclosed, percentage of Manufacturer Payments under a variety of labels; (2) using rebate aggregators to further shield Manufacturer Payments from pass-through obligations; (3) using the inflated list price to generate profits from pharmacies, including through clawbacks and post-purchased discounts; and (4) relying on the inflated list price to drive up the PBMs' spread income, including through increased margins captured by their own affiliated pharmacies.

---

[168] Karen Van Nuys et al., *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans from 2014 to 2018*, J. Am. Med. 11 (Nov. 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932#:~:text=While%20we%20estimate%20that%20proceeds,compared%20with%2016.5%25%20in%202014.

265.   Over time, payors such as M-NCPPC did secure contract provisions guaranteeing payment to them of a certain amount of prescription drug rebate payments per paid brand-name prescription drug claim. Critically, however, these "rebates" to M-NCPPC, shrouded in secrecy and narrowly defined, are only a fraction of the total undisclosed Manufacturer Payments.

### E.    The Insulin Pricing Scheme Reflects the PBM Defendants' Self-Dealing.

266.   The PBM Defendants depend on the lack of transparency to conduct their business. They have vigorously resisted any requirement that they disclose the details of their agreements with drug manufacturers and the kickbacks they receive from them, as well as their agreements with the insurers and pharmacies.[169]

267.   At the same time, the PBM Defendants have consistently insisted that they are transparent about the rebate payments and the amounts they remit to payors. For example, in 2011, OptumRx's President stated that "[w]e want our clients to fully understand our pricing structure . . . [e]very day we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."[170] Express Scripts' CEO similarly stated

---

[169] *Id.*

[170] *Prescription Solutions by OptumRx Receives 4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards*, UnitedHealth Grp. (Sept. 13, 2011), https://web.archive.org/web/20210805182422/https://www.unitedhealthgroup.com/newsroom/2011/0913tipps.html.

in 2017 that Express Scripts was "absolutely transparent" about rebate payments and that payors "know exactly how the dollars flow" with respect to those payments.[171] And CVS executives have stated that it "provide[s] full visibility to our clients of all our contracts and the discounts that we negotiate on their behalf . . . And transparency—today we report and fully disclose not only to our clients, but to [Centers for Medicare and Medicaid Services]."[172]

268.   Health plan payors were not involved in the negotiation of the contracts between the PBM and Manufacturer Defendants, and the PBM Defendants disclosed only the fact that such relationships may exist. But the terms of the contracts, the consideration exchanged between the PBM and Manufacturer Defendants, and the means of reaching these determinations all were—and remain—shrouded in secrecy.

269.   The PBM and Manufacturer Defendants thus created a "hide-the-ball" system where health plan payors like Plaintiff are not privy to rebate negotiations or contracts between the Manufacturers and the PBM Defendants. Through this "hide-the-ball" system, the PBM and Manufacturer Defendants are able to

---

[171] *Express Scripts CEO Tim Wentworth Defends Role of PBMs in Drug Prices* (video), CBS News (Feb. 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/.

[172] *Drug Pricing in America: A Prescription for Change*, Part III, Hearing Before the S. Comm. on Fin., at 28, 32 (Apr. 9, 2019), https://www.finance.senate.gov/imo/media/doc/435631.pdf.

manipulate their rebate negotiations and contracts in their best interest, rather than in the best interest of health plan payors like M-NCPPC.

270.    Despite the PBM Defendants' insistence that they are transparent with their health plan payors, there is zero transparency as to what money the PBM Defendants receive from the Manufacturer Defendants and what money the PBM Defendants remit to health plan payors like M-NCPPC. The system is designed so that the PBM and Manufacturer Defendants retain control and profit.

271.    This is evidenced by the PBM's efforts to re-label manufacturer rebates to minimize their pass-through obligations, the PBM's increasing use of and reliance on rebate aggregators, and the inability of health plan payors, such as Plaintiff, to conduct a meaningful audit of the PBM's rebate arrangements with the Manufacturer Defendants and rebate aggregators.

## 1.    Relabeling of "Rebates"

272.    The consideration exchanged between the PBM and Manufacturer Defendants is continually labeled and relabeled in order to allow the PBM Defendants to retain an increasing percentage of the total payments received from the Manufacturer Defendants while purporting to pass through increasing rebate amounts to health plan payors such as Plaintiff. As more payors have moved to contracts with the PBM Defendants that require the PBM Defendants to remit some or all of the manufacturer "rebates" through to the payor, the PBM Defendants have

moved to relabel these manufacturer "rebates" more broadly as various "fees," "discounts," and the like in order to better shield them from scrutiny and minimize their pass-through obligations.

273.    Specifically, in order to maintain their ever-growing profits, while claiming that "rebates" are passing through to payors, the PBM Defendants have relabeled the payments they receive from the Manufacturer Defendants as, *inter alia*, "administrative fees," "volume discounts," "concurrent or retrospective discounts," "service fees," "fees for services rendered," "fees for property provided," "inflation fees," or other industry terms designed to obfuscate the substantial sums being secretly exchanged between the PBM and Manufacturer Defendants.

274.    The Senate Commerce, Science and Transportation Committee recently released testimony from David Balto—a former antitrust attorney with the DOJ and Policy Director for the FTC's Bureau of Competition—from a hearing on fairness and transparency in drug pricing:

> The PBM rebate system turns competition on its head with PBMs seeking higher, not lower prices to maximize rebates and profits. In the past decade, PBM profits have increased to $28 billion annually . . . PBMs establish tremendous roadblocks to prevent payors from knowing the amount of rebates they secure. Even sophisticated buyers are unable to secure specific drug by drug rebate information. PBMs prevent payors from being able to audit rebate information. As the Council of Economic Advisors observed, the PBM market lacks transparency as "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." Without

adequate transparency, plan sponsors cannot determine if the PBMs are fully passing on any savings, or whether their formulary choices really benefit the plan and subscribers.[173]

275.  The relabeled, undisclosed Manufacturer Payments are substantial. "Administrative fees" are just one example. A heavily redacted complaint filed by Defendant Express Scripts in 2017 revealed that Express Scripts retains up to fifteen times more in "administrative fees" than it remits to payors in rebates.[174]

276.  These so-called administrative fees typically are based on a percentage of the list price—as opposed to a flat fee—such that even if the actual "administrative" cost associated with processing two drugs is the same, the "administrative fee" would be correspondingly higher for the higher-priced drug, which again creates (by design) a perverse incentive to give preference to more expensive drugs.

277.  These administrative fees and other payments are typically beyond a payor's contractual audit rights because those rights are limited to "rebate" payments and these "administrative fees" have been carved out from the definition of "rebates."

---

[173] Testimony of David A. Balto before the U.S. S. Comm. on Com., Sci., & Transp.: Subcomm. Consumer Prot., Prod. Safety, & Data Sec. entitled "Ensuring Fairness and Transparency in the Market for Prescription Drugs," at 2-3, 5 (May 5, 2022), https://www.commerce.senate.gov/services/files/5807DDD6-EA20-42A4-97B1-73541F832839.
[174] Complaint, *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-1520-RLW (E.D. Mo. May 16, 2017), ECF No. 1.

278.   It has been suggested that pharmacy benefit managers "designate as much as twenty-five or thirty percent of the negotiated rebates as fees to avoid sharing the rebates."[175]

279.   Although the proportion of rebates retained by the PBM Defendants remains a secret, evidence suggests that the amounts of rebates passed on to the client varies dramatically among the PBM Defendants and their clients.[176] And there is reason to believe that the proportion of rebates retained by the PBM Defendants is substantial. A review of Texas-mandated pharmacy benefit manager disclosures showed that pharmacy benefit managers retain a much greater percentage of manufacturer rebates than they let on.[177] Under Texas law, pharmacy benefit managers are required to report the "aggregated rebates, fees, price protection payments, and any other payments collected from pharmaceutical drug manufacturers." This review showed that in 2021, pharmacy benefit managers retained 13% of manufacturers' total payments ($752 million).[178] Between 2016

---

[175] Joanna Shepherd, *Pharmacy Benefit Managers, Rebates, and Drug Prices: Conflicts of Interest in the Market for Prescription Drugs*, Yale Law & Pol'y Rev., https://openyls.law.yale.edu/bitstream/handle/20.500.13051/17295/auto_convert.pdf?sequence=3&isAllowed=y.
[176] *Id.*
[177] Adam Fein, *Texas Shows Us Where PBMs' Rebates Go*, Drug Channels (Aug. 9, 2022), https://www.drugchannels.net/2022/08/texas-shows-us-where-pbms-rebates-go.html.
[178] *Id.*

Complaint- 112

and 2021, pharmacy benefit managers retained between 9% and 21% of total manufacturer payments.[179]

280.    In an attempt to quantify the revenue pharmacy benefit managers receive from retained rebates, a September 2023 report by Nephron Research found that pharmacy benefit managers' compensation from rebates and other kickbacks doubled between 2018 and 2022, from $3.8 billion to $7.6 billion.[180] "This growth was fueled by increases in traditional administrative fees as well as the emergence of new data and PBM contracting entity fees."[181] During the same period, "administrative fees" grew from $3.8 to $5.8 billion.[182]

281.    Further, because many rebate-sharing arrangements are based on a percentage of rebates received by the PBM Defendants, as drug manufacturers continue to artificially increase the price of insulin, the dollar amount retained by the PBM Defendants will continue to increase, even if the percentage passed through

---

[179] *Id.*

[180] *Trends in Profitability and Compensation of PBMs and PBM Contracting Entities*, Nephron (Sept. 18, 2023), https://nephronresearch.bluematrix.com/sellside/AttachmentViewer.action?encrypt=1c65fc0e-f558-4f1d-891f-21c196a9f1ad&fileId=7276_04a77b17-d298-48a2-bd15-1c5ed22a6984&isPdf=false.

[181] *Id.* at 2.

[182] *Id.*

stays the same.[183] Thus, through the Insulin Pricing Scheme, the PBM Defendants continue to garner greater and greater profits at the expense of health plan payors like Plaintiff.

282.    The opaque nature of these arrangements between the Manufacturer and PBM Defendants also makes it impossible for a given payor to discover, much less assess or confront, conflicts of interest that may affect it or its members or beneficiaries. The Senate Insulin Report observed with respect to these arrangements: "Relatively little is publicly known about these financial relationships and the impact they have on insulin costs borne by consumers[.]"[184]

## 2.    Rebate Aggregators

283.    The PBM Defendants also use "rebate aggregators" to further the Insulin Pricing Scheme.

284.    Rebate aggregators, sometimes called group purchasing organizations ("GPOs"), negotiate and contract for manufacturer rebates on behalf of pharmacy benefit managers, including the PBM Defendants. These rebate aggregators collect rebates and other fees for their pharmacy benefit manager clients.

---

[183] *A View from Congress: Role of Pharmacy Benefit Managers in Pharmaceutical Markets*, H.R. Comm. on Oversight & Reform (Dec. 10, 2021), https://oversight.house.gov/wp-content/uploads/2021/12/PBM-Report-12102021.pdf.
[184] U.S. S. Fin. Comm., *supra* n.9, at 4.

285.    Between 2018 and 2022, Defendants Express Scripts, CVS Caremark, and OptumRx each formed their own rebate aggregator to outsource the negotiation and collection of rebates and other fees to a subsidiary, and impose new fees on the Manufacturers, purportedly for the aggregator's services. These rebate aggregators, Ascent Health Services LLC (established and controlled by Express Scripts), Zinc Health Services, LLC (established and controlled by CVS Caremark), and Emisar Pharma Services LLC (established and controlled by OptumRx)—collectively the "Rebate Aggregator Defendants"—perform much of the same rebate negotiating and contracting functions that Defendants Express Scripts, CVS Caremark, and OptumRx previously handled directly.[185]

286.    The PBMs established these GPOs between 2018 and 2021, in response to mounting pressure from payors to pass through more rebates and other payments collected from the Manufacturers and anticipated Congressional action that would have required more transparency from the PBMs.

287.    To avoid passing these rebates and other payments through to payors, the PBMs adjusted their business models by adding rebate aggregators to the pharmaceutical payment chain.

---

[185] Before establishing Emisar, OptumRx worked with a second rebate aggregator, Coalition for Advanced Pharmacy Services ("CAPS"), that is operated by OptumRx's parent company, UnitedHealth Group.

288.   As summarized by the recent Community Oncology Alliance report:[186]

> PBMs have increasingly "delegated" the collection of manufacturer rebates to "rebate aggregators," which are often owned by or affiliated with the PBMs, without seeking authorization from plan sponsors and without telling plan sponsors. . . . Even some of the major PBMs (i.e., the "Big Three" PBMs) sometimes find themselves contracting with other PBMs' rebate aggregators for the collection of manufacturer rebates. . . . In both the private sector and with respect to government health care programs, the contracts regarding manufacturer rebates (i.e., contracts between PBMs and rebate aggregators, as well as contracts between PBMs/rebate aggregators and pharmaceutical manufacturers) are not readily available to plan sponsors.

289.   The PBM Defendants' rebate aggregators allow the PBMs to further obfuscate the rebate payment trail and extract additional profits from their contracts with payors.

290.   PCMA, the industry group of PBMs, stated that rebate aggregators "help PBMs to use scale and leverage to more aggressively negotiate with (drugmakers) to lower the cost of drugs for clients and consumers. The core mission

---

[186] Community Oncology Alliance & Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers, and Taxpayers*, at 15–16 (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf.

of PBMs is to provide improved access to needed medications by lowering costs."[187]

291.  In reality, the picture appears to be much different. The Rebate Aggregator Defendants are either owned by the PBM Defendants or closely affiliated. The PBM Defendants' contracts with these Rebate Aggregator Defendants provide that the Rebate Aggregator Defendants will negotiate and receive rebates from drug manufacturers for certain drugs based on the drug utilization of the participants of plans served by the PBM Defendants. The Rebate Aggregator Defendants will then pay the PBM Defendants some amount per prescription, which becomes part of the "rebate" the PBM Defendants must pass through (in whole or in part) to its clients, including Plaintiff. This system allows the Rebate Aggregator Defendants to retain any difference between the rebates paid by the Manufacturer Defendants and the payments the Rebate Aggregator Defendants pay to the PBM Defendants.

292.  As with the PBM Defendants, the Rebate Aggregator Defendants benefit from a higher list price. Both the PBM Defendants and the Rebate Aggregator Defendants retain a portion of the various fees, including

---

[187] Marty Schladen, *Already concerned with drug costs, large employers, family pharmacists worry about more middlemen,* Ohio Cap. J. (Sept. 2, 2021), https://ohiocapitaljournal.com/2021/09/02/already-concerned-with-drug-costs-large-employers-pharmacists-worry-about-another-layer-of-middlemen/.

administrative fees, they charge the Manufacturer Defendants. Since these fees are typically calculated as a percentage of the list price, the Rebate Aggregator Defendants, as well as the PBM Defendants, collect higher fees as a result of higher list prices.

293.   The PBM Defendants and Rebate Aggregator Defendants benefit from these higher fees, even though the services they provide stay the same. On September 20, 2024, the Federal Trade Commission brought suit against the PBM Defendants and their affiliated rebate aggregators for violations of Section 5 of the Federal Trade Commission Act "for engaging in anticompetitive and unfair rebating practices that have artificially inflated the list price of insulin drugs, impaired patients' access to lower list price products, and shifted the cost of high insulin list prices to vulnerable patients."[188]

294.   Specifically, the recent FTC Complaint revealed, among other things, (a) that the PBM Defendants' affiliated rebate aggregators "now perform the same commercial contracting function that the PBMs previously handled directly" and that the PBM Defendants "simply moved their commercial rebate contracting functions" to their affiliated rebate aggregators; (b) that the rebate aggregators solicit commercial bids from manufacturers using rebate grids "with different

---

[188] *FTC v. CaremarkRx, LLC*, No. 221 0114 (FTC Sept. 20, 2024), ECF No. 9437, at 27.

rebate rates for different levels of exclusivity: exclusive coverage (1 of 1 manufacturer), dual coverage with another manufacturer (1 of 2), and multiple manufacturers (1 of many)"; and (c) that the rebate aggregators extract WAC-based fees from drug manufacturers as part of commercial negotiations but "provide no additional services to justify the higher payout on higher list price drugs from the assortment of WAC-based fees" the rebate aggregators extract from the manufacturers.

295.   As explained in the FTC Administrative Complaint, the PBM Defendants and Rebate Aggregator Defendants "extracted and pocketed . . . [redacted] dollars without providing any additional value."[189]

296.   The rebates retained by the Rebate Aggregator Defendants and the revenues the PBM Defendants ultimately obtain from the Rebate Aggregator Defendants is hidden. The contractual provisions between PBM Defendants and the Rebate Aggregator Defendants —as well as those between PBM Defendants, Rebate Aggregator Defendants, and pharmaceutical manufacturers—also remain hidden from health plan payors. The contracts between health plan payors and the PBM Defendants are often silent on the role of rebate aggregators. For instance, a review of Orange County, California's contract with OptumRx showed that the contract language did not address rebate dollars retained by OptumRx's

---

[189] *Id.*

subcontracted or affiliated rebate aggregators.[190] Thus, PBM Defendants can conceal payments through these rebate aggregator agreements, allowing them to falsely claim that they pass through all or a substantial portion of their rebates, while pocketing large profits.

297.    Similarly, a 2017 audit conducted by a local governmental entity on OptumRx related to its PBM activities from 2013 to 2015 was unable to verify the percentage of rebates OptumRx remitted to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under their model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[191]

---

[190] Jonathan Levitt, *Pharmacy Benefit Managers and the Prescription Drug Supply Chain: Impact on Patients and Taxpayers*, Written Testimony Before the U.S. S. Comm. on Fin. (Feb. 2022), https://www.finance.senate.gov/imo/media/doc/Jonathan%20Levitt%20Testimony%20US%20Senate%20Committee%20on%20Finance%20-%20Frier%20Levitt%20-%20March%202023_Redacted1.pdf.

[191] Laura Rogers & Stacey Thomas, Broward Cnty., Fla., Audit of Pharmacy Benefit Management Services Agreement, No. 18-13, at 3 (Dec. 7, 2017), https://cragenda.broward.org/docs/2018/CCCM/20180109_555/25990_2017_1212%20Exh1_OptumRx%20-%20Revised%20Item.pdf..

298.   A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc. (ESI)."[192]

299.   In other words, according to this report, OptumRx contracted with its own affiliate aggregator, CAPS, which then contracted with OptumRx's co-conspirator Express Scripts, which then contracted with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then used this complex relationship to mask the amount of Manufacturer Payments generated from its client's utilization.

300.   A subsequent audit by the same local entity, covering the period September 2017 to September 2018, concluded:

> Several material weaknesses in Broward's agreement with Optum[Rx] were identified, many of which are commonplace across pharmacy benefit manager agreements in general . . . Due to contract weaknesses, a comparison of Broward's PBM agreement, including rebate amounts received, to the Consultant's marketplace data is not feasible. Broward could save an estimated $1,480,000 per year in net prescription drug benefit expenses (based upon minimum rebate guarantees) by switching from its current flawed agreement with Optum[Rx], to an agreement with its Coalition, which offers clearly defined terms, increased rebate guarantees and cost saving requirements.[193]

---

[192] *Id.* n.3.

[193] Broward Cnty., Fla., *Analysis of Broward County's Prescription Drug Coverage*, No. 19-15 at 2 (July 31, 2019), https://www.broward.org/Auditor/Reports/Reports/082019_Exh1_BCRxDrug_19-15.pdf.

301.   Among other "loopholes" discovered in the contract were a number of "flawed" (i.e., vague and manipulable) definitions, including (a) the definition of "Rebates," which "allows the exclusion of monies that should be included" and (b) limitations with respect to "Pass Through Transparency Pricing."

302.   As a result, these fees are neither passed through to payors nor subject to audit under the terms of payors' sponsor agreements with the PBMs. Because the rebate aggregators are PBM subsidiaries, however, the PBMs secure additional profits from each drug purchase.

303.   Payors cannot trace these additional amounts, as they are negotiated and collected by the PBMs' affiliate-GPOs and not the PBM-entities that contract with payors. These amounts are not subject to audit, nor do the PBMs disclose the various "fees" the GPOs collect and retain to the SEC or elsewhere. Discussing the lack of transparency regarding rebate aggregators, Stephanie Seadler, Vice President of Trade Relations at EmsanaRx noted that "And so while they [i.e., employers] are getting some rebates, they are not getting everything. They're also not getting the data to help validate what they're getting. I think that's changed a lot with the GPOs because it's easy for the PBM to say, 'The GPO is a third party. We don't own those contracts, and because we don't own them, we can't give the

data and the transparency because they're not ours.' It's time to rethink what that looks like."[194]

304.  This lack of transparency is intentional. As a former Optum executive who helped form Emisar explained, "[t]he intention of the G.P.O. is to create a fee structure that can be retained and not passed on to a client."[195]

305.  Although the revenues retained by the PBM Defendants and the Rebate Aggregator Defendants remain hidden, there is evidence to suggest the retained rebate amounts are substantial. A Medicare plan audited its pharmacy benefit manager and found that the "rebate aggregator collected all the dollars, and it only gave about 40% of those dollars to the PBM."[196] Thus, while the pharmacy benefit manager contract stated that the PBM would pass through 90% of the rebates to the plan, it neglected to mention that "the PBM rebate aggregator had sucked 62% of the money out the system."[197]

306.  A September 2023 report by Nephron Research demonstrated the increased reliance by pharmacy benefit managers on rebate aggregators, finding

---

[194] Angela Maas, *How Do Pharma/PBM Contracts Play Role in Rebate Leakage? Part 2*, Managed Mkts. Insight & Tech. (Apr. 21, 2022), https://www.mmitnetwork.com/aishealth/spotlight-on-market-access/how-do-pharma-pbm-contracts-play-role-in-rebate-leakage-part-2/.
[195] *See* FTC Complaint, *supra* n.188, at 10.
[196] Rose McNulty, *In Drug Pricing, PBMs Called the "Arsonist and the Firefighter in One,"* Am. J. of Managed Care (Dec. 16, 2020) https://www.ajmc.com/view/in-drug-pricing-pbms-called-the-arsonist-and-the-firefighter-in-one-.
[197] *Id.*

that payments to pharmacy benefit managers generated by their rebate aggregators grew from almost zero in 2018 to more than $1.7 billion in 2022.[198]

307.   Concerned about the rebate aggregators, the Federal Trade Commission issued compulsory orders to two of the Rebate Aggregator Defendants in May 2023—Zinc Health Services (which operates as the rebate aggregator for CVS Caremark) and Ascent Health Services (which operates as the rebate aggregator for Express Scripts and Prime Therapeutics, among others).[199]

308.   Dave Ricks, CEO of Eli Lilly, stated that the majority of the $8 billion Eli Lilly paid in 2022 in rebate checks went to rebate aggregators, rather than directly to pharmacy benefit managers.[200]

309.   A number of the Rebate Aggregator Defendants are headquartered abroad. For instance, Ascent, the aggregator for Express Scripts, is based in Switzerland, and Emisar Pharma Services, the aggregator established by OptumRx, is based in Ireland.[201] This only serves to help the pharmacy benefit managers keep the true rebate payments hidden from payors and plan sponsors.

---

[198] Nephron, *supra* n.180.
[199] Victoria Graham, *FTC Deepens Inquiry into Prescription Drug Middlemen*, FTC (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ftc-deepens-inquiry-prescription-drug-middlemen.
[200] Arthur Allen, *A More Aggressive FTC Is Starting to Target Drug Mergers and Industry Middlemen*, KFFHealthNews (May 22, 2023), https://kffhealthnews.org/news/article/a-more-aggressive-ftc-is-starting-to-target-drug-mergers-and-industry-middlemen/.
[201] *Id.*

310.    As reported in the 2021 Grassley-Wyden Senate Report, there are presently no efforts to change or restrict the group purchasing organization safe harbor rules.[202]

### 3.    Illusory Audit Provisions

311.    The PBM Defendants are able to shield the true magnitude of profit from rebates and other fees through the relabeling of these rebates and the use of rebate aggregators. They also shield the true magnitude of profit by providing health plan payors, such as Plaintiff, no meaningful opportunity to audit their pharmacy benefit services and their contracts with the Manufacturer Defendants and Rebate Aggregator Defendants.

312.    The PBM Defendants assert that their contracts with the Manufacturer Defendants and the Rebate Aggregator Defendants are confidential and proprietary. Accordingly, any audit done by a health plan payor, such as Plaintiff, would not reveal the details of the rebate arrangements. And because the Rebate Aggregator Defendants contract directly with the Manufacturer Defendants, the PBM Defendants can tell health plan payors that they have no insight into those contracts. By creating rebate aggregators, the PBMs have created a new middleman that allows them to sequester off payments made from Drug Manufacturers,

---

[202] U.S. S. Fin. Comm., *supra* n.9.

without having to include any contractual language regarding these rebate aggregators in their contracts with health plan payors.

313.   Health plan payors, such as Plaintiff, are left with no real avenue to ascertain what amount of rebates and fees the PBM Defendants receive from the Drug Manufacturers. Likewise, health plan payors, such as Plaintiff, are left with no real avenue to ascertain whether these rebates and fees are being passed through.

**F.    Insulin Adjuncts: Type 2 Medications**

314.   Over the past 15 years, the Manufacturer Defendants released several non-insulin medications that help control insulin levels. In 2010, Novo Nordisk released Victoza, and thereafter Eli Lilly released Trulicity and Sanofi released Soliqua. Novo Nordisk further expanded their GLP-1 receptor agonist ("GLP-1") patent portfolio with the approval of Xultophy and Ozempic, drugs that mimic the naturally occurring GLP-1 hormone, thereby triggering insulin release from the pancreas to help manage blood sugar levels.[203] In 2022, Eli Lilly received approval for yet another GLP-1, Mounjaro. Each of these medications can be used in conjunction with insulins to control diabetes.

---

[203] Victoza, Trulicity, Ozempic, and Mounjaro are glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone produced in the body. Soliqua and Xultophy are combination long-acting insulin and GLP-1 drugs.

315.    Manufacturers negotiate rebates and other fees with PBMs as a single diabetes drug class that includes insulin and GLP-1 medications. This practice is known as "bundling."

316.    Manufacturer Defendants bundle medications to gain formulary access for multiple drugs in exchange for increased manufacturer payments to PBMs.

317.    In 2013, Novo Nordisk tied its "exclusive" rebates for insulin to formulary access for GLP-1 medication, Victoza. The exclusive rebates of 57.5% for Novolin, Novolog, and Novolog Mix 70/30 were more than three times higher than the 18% rebate for plans that included two insulin products on their formulary. In order to qualify for the exclusive rebate, the plans would also need to list Victoza on their formulary, exclude all competing insulin products, and ensure existing patients switch from competitor diabetes medications.[204]

318.    Upon information and belief, all Manufacturer Defendants negotiate the prices of insulin and GLP-1 medications through bundling.

319.    The first GLP-1 was approved by the FDA in 2005 and was indicated for the treatment of type 2 diabetes. Currently, the GLP-1 market is consolidated among a limited number of patent-holding entities, with Manufacturer Defendants Eli Lilly, Novo Nordisk, and Sanofi controlling much of this market.

---

[204] U.S. S. Fin. Comm., *supra* n.9, at 78 and 79.

320.  Through extensive patents and regulatory exclusivities, the Manufacturer Defendants have effectively barricaded competition from the GLP-1 market, giving them the ability to exercise comprehensive control over the price of GLP-1 medications.

321.  To date, no generic alternative exists for any GLP-1 medication and the Manufacturer Defendants will continue to enjoy patent protection of their respective GLP-1 agonist molecules through at least 2030, if not later.[205]

322.  Novo Nordisk developed and sells three GLP-1 drugs indicated for type 2 diabetes: Victoza (liraglutide), Xultophy (insulin degludec/liraglutide) and Ozempic (semaglutide). Novo Nordisk holds 62 patents related to semaglutide and liragutide—46 of those patents are device patents unrelated to the therapeutic molecule of the GLP-1.[206]

323.  Eli Lilly developed and sells two GLP-1 drugs indicated for type 2 diabetes: Trulicity (dulaglutide) and Mounjaro (tirzepatide/GIP). Eli Lilly holds 18 patents related to dulaglutide and tirzepatide. Of the four patents related to tirzepatide, two of those patents are device patents unrelated to the therapeutic

---

[205] Alhiary, Rasha et al., *Patents and Regulatory Exclusivities on GLP-1 Receptor Agonists*, J. Am. Med. Ass'n, 330, 650–657 (July 28, 2023), https://jamanetwork.com/journals/jama/article-abstract/2808050.
[206] *Id.*

molecule of the GLP-1. Eli Lilly has applied for 78 patents related to dulaglutide, 17 of which have been granted to date.[207]

324.    Sanofi developed Adylxin (lixisenatide) and Soliqua (insulin glargine/lixisenatide) but currently only sells Soliqua in the United States. Sanofi holds 42 patents related to lixisenatide – 29 of those patents are device patents unrelated to the therapeutic molecule of the GLP-1.[208]

325.    This patent stacking and evergreening ensures that generic and other branded GLP-1s cannot enter the market and gives Novo Nordisk, Eli Lilly, and Sanofi disproportionate pricing power over GLP-1 medications.

326.    In addition to the limited competition in the GLP-1 landscape, Manufacturer and PBM Defendants use this disproportionate pricing power to steadily raise the price of GLP-1s, consistent with the broader Insulin Pricing Scheme.

---

[207] *Id.*
[208] *Id.*



327.   As shown above, counterintuitively, list and net prices increased as more GLP-1 medications were approved and introduced. Between 2007 and 2017 the average list price of GLP-1s rose 15% per year despite the introduction of competing brands. The net price increased an average of 10% per year during the same time period.[209]

328.   The PBM Defendants are also central to these price increases, which are untethered from marketing, manufacture, distribution, and research and development costs. As shown in the chart above, the growing disconnect between list prices and net prices of these drugs further demonstrates the PBM Defendants'

---

[209] Sarpatwari, Ameet et al., *Diabetes Drugs: List Price Increases Were Not Always Reflected In Net Price; Impact Of Brand Competition Unclear,* Health Affairs, 40, 772–778 (2021), https://www.healthaffairs.org/doi/10.1377/hlthaff.2020.01436.

ill-gotten gains, obtained through methods identical to those employed in the Insulin Pricing Scheme.

329. As with insulin, the absence of generics in the GLP-1 market allows manufacturers to keep prices artificially high. PBMs then realize the benefit of these artificially high prices through Manufacturer Payments in exchange for formulary placement. PBMs and manufacturers are thus incentivized to increase prices or maintain high, untethered prices for GLP-1s.

330. Further, GLP-1s are significantly more expensive in the United States compared to other countries, indicating that the increasing price of GLP-1s is unrelated to any competitive or fair market price. For example, in 2023, the list price for a one-month supply of Ozempic was about $936 in the United States, $147 in Canada, $103 in Germany, $93 in the United Kingdom, $87 in Australia, and $83 in France.

331. In 2018, Victoza's list price in the United States was more than double its average list price in eleven comparable countries and Trulicity's list price in the United States was more than six times its average list price in eleven comparable countries. One study found that drug companies could profitably sell certain GLP-1s, including Ozempic, for $0.89–$4.73 per month.

332.   In March 2024, PBM Defendant Evernorth entered into a financial guarantee agreement for GLP-1 spend with Manufacturer Defendants Novo Nordisk and Eli Lilly to limit the annual cost increase of GLP-1s to 15%.[210]

333.   Like the caps put in place for insulin, the Evernorth agreement suggests that the price of GLP-1s before March 2024 was not raised to cover costs of research and development, manufacture, distribution, or any other necessary expense. Such cost caps and savings guarantees indicate that the increasing price of GLP-1s was unrelated to any legal, competitive, or fair market price. Further, this agreement is prospective and does not mitigate damages already incurred by payors like Plaintiff, who have spent substantial sums on GLP-1 drugs in connection with the self-insured plan at issue in this case.

## G.   The Maryland-National Capital Park and Planning Commission Purchased At-Issue Drugs Directly from Defendant CVS Caremark.

334.   Defendants' schemes to make increasingly larger profits from the at-issue drugs have devastating effects on consumers and come at a significant cost to health plan payors, like M-NCPPC, who pay for their Beneficiaries' pharmaceutical purchases. Payors like Plaintiff rely on the PBM Defendants to control the costs of prescription medications and lower their administrative

---

[210] *Evernorth Announces Industry-First Financial Guarantee GLP-1 Spend,* Evernorth Health Servs. (Mar. 7, 2024) https://www.evernorth.com/articles/evernorth-announces-industry-first-financial-guarantee-glp-1-spend.

burdens. The resulting financial impact on the Park and Planning Commission is substantial given its unique obligations.

335.   Any significant increase in spending can negatively impact the ability of the Park and Planning Commission to provide essential services to the residents of the Montgomery County and Prince George's County regions.

336.   M-NCPPC provides its Beneficiaries with ample benefits, including paying for a large portion of its Beneficiaries' pharmaceutical purchases. In this role, Plaintiff spent substantial sums of money on the diabetes medications at issue.

337.   In its role as a payor, M-NCPPC maintains a self-funded plan. This means Plaintiff, rather than an insurance provider, pays for pharmaceutical benefits and prescription drugs, including the diabetes medications at issue here. Because of the Park and Planning Commission's self-funded status, it does not rely on a third-party insurer to pay for its Beneficiaries' medical care, pharmaceutical benefits, or prescription drugs.

338.   M-NCPPC pays for a significant portion of the price of the drugs at issue and has not knowingly participated in Defendants' Insulin Pricing Scheme. In particular, after Beneficiaries pay their portion of the costs of insulin drugs manufactured by the Manufacturer Defendants, M-NCPPC pays the remaining portions of the cost directly to its PBM, CVS Caremark, in connection with its self-insured plan for its Beneficiaries. M-NCPPC pays these amounts on a regular basis.

During the at issue period, M-NCPPC has paid Defendant CVS Caremark substantial sums of money to cover its portion of the costs of the at-issue insulin drugs.

339.  By purchasing the drugs at issue from CVS Caremark directly, Plaintiff has suffered losses because of the inflated prices resulting from Defendants' Insulin Pricing Scheme. Plaintiff pays its PBM artificially inflated costs resulting from the Insulin Pricing Scheme because its payments are derived from the artificially inflated insulin list prices. Plaintiff cannot avoid paying these sky-high, artificially inflated prices because of Defendants' exclusive control over the market for these life-saving drugs.

340.  As a result of Defendants' Insulin Pricing Scheme, diabetes medications are a significant financial expense for Plaintiff. Indeed, in 2021 and 2022, antidiabetic medications were the highest costing therapeutic class by gross cost for M-NCPPC.  Specifically, in 2021, Ozempic, Trulicity, Tresiba Flextouch, and Victoza ranked tenth, twelfth, nineteenth, and twenty-fifth, respectively, among the top twenty-five drugs by expense for M-NCPPC. In 2022, Ozempic, Trulicity, Novolog, Tresiba Flextouch, and Novolog Flexpen ranked second, third, fourteenth, nineteenth, and twenty-second, respectively, among the top twenty-five drugs by expense for M-NCPPC. Within the top twenty-five non-specialty drugs by expense for M-NCPPC in 2021, six were at-issue medications, including

Trulicity, Ozempic, Novolog, Tresiba Flextouch, Novolog Flexpen, and Basaglar Kwikpen. And within the top twenty-five non-specialty drugs by expense for M-NCPCC in 2022, seven were at-issue medications, including Ozempic, Trulicity, Novolog, Tresiba Flextouch, Novolog Flexpen, Rybelsus, and Basaglar Kwikpen.

341. During the relevant period, Plaintiff purchased diabetes medications, including those manufactured by the Manufacturer Defendants, such as Humulin R 500, Novolin, Novolin R, Novolin 70/30 Flexpen, Novolog, Novolog Flexpen, Levemir, Basaglar Kwikpen, Toujeo Solostar, Tresiba, Trulicity, Mounjaro, Victoza, Ozempic, Rybelsus, and Soliqua.

342. Plaintiff relies on CVS Caremark in administering its health plans' pharmaceutical services. The services CVS Caremark has provided Plaintiff include constructing and managing Plaintiff's pharmacy network (which included dispensing the at-issue drugs through the PBMs' retail and mail-order pharmacies) and adjudicating and processing pharmacy claims. Specifically, Plaintiff relies on CVS Caremark to limit its administrative burden and control pharmaceutical drug costs.

343. Plaintiff has relied on Defendant CVS Caremark to provide PBM services to its health plans throughout the relevant period.

344.    Plaintiff's PBM, Defendant CVS Caremark, participated in the Insulin Pricing Scheme, which increased the prices Plaintiff paid Defendant CVS Caremark for these diabetic medications.

345.    Neither the PBM nor the Manufacturer Defendants suffer losses from the Insulin Pricing Scheme. On the contrary, the PBM and Manufacturer Defendants financially benefit from the Insulin Pricing Scheme at Plaintiff's expense. And Defendant CVS Caremark benefited from the Insulin Pricing Scheme despite its duties to limit Plaintiff's administrative burden and control pharmaceutical drug costs.

## H.    The Insulin Pricing Scheme Has Injured Maryland-National Capital Park and Planning Commission.

346.    Plaintiff M-NCPPC provides health and pharmacy benefits to its Beneficiaries, including employees, their dependents, and retirees. During the relevant period, Plaintiff has provided these benefits to over 5,400 beneficiaries on an annual basis.

347.    One of the primary benefits the Park and Planning Commission provides its members' Beneficiaries through its employee health plans is paying a significant portion of the Beneficiaries' prescription drug costs.

348.    Through purchasing its Beneficiaries' prescription drugs, including diabetic medications Humulin R 500, Novolin, Novolin R, Novolin 70/30 Flexpen, Novolog, Novolog Flexpen, Levemir, Basaglar Kwikpen, Toujeo Solostar, Tresiba,

Trulicity, Mounjaro, Victoza, Ozempic, Rybelsus, and Soliqua, Plaintiff has interacted with and engaged in business with the PBM Defendants concerning their pharmacy benefit services and the at-issue diabetes medications for years.

349.   At all times until late 2024, Plaintiff was unaware of the full nature and extent of the Insulin Pricing Scheme, Defendants' involvement and control over the Insulin Pricing Scheme, and the artificial inflation of the insulin prices it was paying as a result of Defendants' Insulin Pricing Scheme.

350.   Plaintiff relied on Defendants' statements and material omissions made in furtherance of the Insulin Pricing Scheme.

351.   Plaintiff relied on Defendants' misrepresentations in paying for the diabetes medications at issue at prices that would have been lower but for the Insulin Pricing Scheme devised and carried out by Defendants.

352.   Health plan payors, including Plaintiff, were the direct and intended victims of the Insulin Pricing Scheme.

353.   Plaintiff made payments for insulin based on the artificially inflated list prices that resulted from Defendants' Insulin Pricing Scheme.

354.   Plaintiff has spent substantial sums of money on the at-issue medications during the relevant time period.

355.   Defendants' relationships with M-NCPPC are inherently unbalanced and their contracts adhesive. Although Defendants supply a vital service of a quasi-

public nature, they nevertheless acted to exploit their superior bargaining positions to mislead Plaintiff and contravene Plaintiff's expectations, all at great expense to M-NCPPC.

356.  Defendants' misrepresentations, omissions, and misconduct in furtherance of the Insulin Pricing Scheme proximately caused economic damage to the Park and Planning Commission as a payor and purchaser of Defendant Manufacturers' at-issue drugs.

357.  A substantial amount of Plaintiff's expenditures on diabetes medications is attributable solely to the artificial inflation of insulin list prices caused by Defendants' Insulin Pricing Scheme.

358.  At all times before late 2024, Plaintiff did not know and could not have known the full extent to which the prices it paid for diabetes medications were and continue to be artificially inflated due to Defendants' Insulin Pricing Scheme. Plaintiff lacked this knowledge because of Defendants' ongoing actions and omissions to conceal their scheme to raise the price of diabetic medications.

359.  Consequently, Plaintiff unknowingly paid excess prices to the Manufacturer Defendants for diabetes medications for years despite receiving a pass-through of some portion of rebates. The prices Plaintiff paid for these diabetes medications would have cost less but for Defendants' acts in carrying out the Insulin Pricing Scheme.

360.   In short, Defendants' Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay—and continue to overpay—for diabetes medications.

361.   Because Defendants continue to generate exorbitant, unfair, and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff is ongoing.

## V.    TOLLING OF THE STATUTES OF LIMITATIONS

362.   Plaintiff has diligently pursued and investigated its claims. Through no fault of its own, Plaintiff did not learn and—given Defendants' coordinated, successful efforts to mislead consumers and health plan payors like Plaintiff—could not have learned the full extent of the Insulin Pricing Scheme and the factual bases for its claims or the injuries suffered therefrom.

363.   Consequently, the following tolling doctrines apply.

## A.    Accrual Rule

364.   Defendants' acts, omissions, and misrepresentations alleged throughout this Complaint have continued to occur through the present day.

365.   For example, in their 2022 SEC Form 10-K Annual Reports, the PBM Defendants represented that they work to reduce costs to the client.

366.    Defendants continue to utilize rebates, relabeled fees, rebate aggregators, clawbacks, and spread pricing to profit from the Insulin Pricing Scheme.

367.    Defendants set artificially inflated list prices for the at-issue insulin drugs. Each new list price is a new and independent act that harms Plaintiff. Plaintiff has overpaid for the at-issue drugs based on the artificially inflated and misrepresented list prices.

368.    The Park and Planning Commission is overcharged for the at-issue drugs on a regular basis as a result of the Insulin Pricing Scheme. Each individual charge to Plaintiff based on the artificially inflated and misrepresented list prices constitutes a new and independent act in furtherance of the Insulin Pricing Scheme.

369.    With each overpayment, Plaintiff suffers a new and accumulating injury. Every additional overpayment arising from Defendants' acts, omissions, and misrepresentations places additional stress on Plaintiff's budget, and in turn, on Plaintiff's ability to provide necessary services to its Beneficiaries.

370.    Had Defendants at any time ceased their wrongful conduct, further injury would have been avoided.

371.    Accordingly, all applicable statutes of limitations are tolled.

**B.     Discovery Rule**

372.   Plaintiff was not aware of the full extent of the Insulin Pricing Scheme until shortly before filing this Complaint. Plaintiff was unaware of the extent to which it was economically injured and unaware that any economic injury was wrongfully caused. Nor did Plaintiff possess sufficient information concerning the injury complained of here, or its cause, to put Plaintiff or any reasonable person on notice that actionable conduct might have occurred.

373.   The PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants, the details of Defendants' negotiations and payments with each other, or their pricing structures and agreements. Defendants labeled these trade secrets, shrouded them in confidentiality agreements, and limited payor audit rights to protect themselves.

374.   Each Defendant group affirmatively and fraudulently blamed the other for the price increases described herein, both during their Congressional testimonies and through the media. All Defendants disavowed wrongdoing and falsely claimed that their dealings with payors like Plaintiff were honest and transparent.

375.   The Park and Planning Commission did not discover and could not have discovered until shortly before filing this Complaint facts sufficient to cause it or any reasonable person to suspect that Defendants were engaged in the Insulin

Pricing Scheme or that M-NCPPC had suffered economic injury as a result of any or all Defendants' wrongdoing. Given Defendants' individual and coordinated efforts to obscure and conceal their misconduct, earlier diligent inquiry would not have disclosed the true facts had Plaintiff been aware of any cause to undertake such an inquiry.

376.    Even today, lack of transparency in the pricing of diabetes medications, and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants, i.e., the Insulin Pricing Scheme, continue to obscure the full nature and extent of Defendants' unlawful conduct from Plaintiff and the general public.

377.    For these reasons, the statutes of limitation did not begin to run until 2023 at the earliest.

## C.    Fraudulent Concealment

378.    Through the acts, omissions, and representations alleged throughout this Complaint, Defendants individually and through their conspiracy fraudulently concealed the fact of Plaintiff's economic injury and its cause.

379.    Defendants' acts, omissions, and representations were calculated to lull and induce payors, including M-NCPPC, into forbearing legal action or any inquiry that might lead to legal action. Defendants' acts, omissions, and

representations were intended to and in fact did prevent Plaintiff from discovering operative facts supporting its claims.

380. Plaintiff acted diligently in pursuing this action once it became aware of facts sufficient to place it on notice of the extent to which it had been harmed and that such harm might have been attributable to misconduct by each or all Defendants, including through Defendants' coordinated efforts to implement and to conceal the Insulin Pricing Scheme.

381. Accordingly, all applicable statutes of limitation have been tolled.

**D.    Equitable Estoppel & Equitable Tolling**

382. Defendants were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided—all of which would be and are now material to Plaintiff.

383. Instead of disclosing these facts, Defendants knowingly misrepresented and concealed them with a reasonable expectation that health plan payors, including Plaintiff, would act upon the misrepresentations and omissions.

384. Being unaware of the true facts and being unaware of the extent of the economic harm it was suffering, Plaintiff did indeed rely in good faith to its detriment on Defendants' misrepresentations and omissions.

385.   In short, through Defendants' acts, omissions, and representations as alleged throughout this Complaint, Defendants knowingly misrepresented and concealed material facts with the expectation that Plaintiff would act upon them and would be misled thereby, which Plaintiff did in good faith and to its detriment.

386.   The Park and Planning Commission acted diligently in pursuing this action once it became aware of facts sufficient to place it on notice of the extent to which it had been harmed and that such harm might have been attributable to misconduct by each or all Defendants, including through Defendants' coordinated efforts to implement and to conceal the Insulin Pricing Scheme. However, Defendants' misconduct served as an extraordinary circumstance that stood in Plaintiff's way and prevented Plaintiff from filing this action earlier.

387.   Accordingly, Defendants are equitably estopped from relying on any statutes of limitation in defense of this action and all statutes of limitation have been equitably tolled.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(C)
### (Against All Defendants)

388.   Plaintiff incorporates by reference all preceding paragraphs up to Section V of this Complaint as though fully set forth herein.

Complaint- 144

389.   Plaintiff brings this count against all Defendants for violations of 18 U.S.C. § 1962(c).

390.   Defendants are (1) culpable "persons" who (2) willfully and knowingly (3) committed and conspired to commit two or more acts of mail and wire fraud (4) through a "pattern" of racketeering activity that (5) involves an "association in fact" enterprise, (6) the results of which had an effect on interstate commerce.

## A.   Defendants Are Culpable "Persons" Under RICO.

391.   Defendants, separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each Defendant is capable of holding a legal or beneficial interest in property.

392.   Each one of Defendants are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

## B.   The Manufacturer–PBM RICO Enterprises

393.   For the purposes of this claim, the RICO enterprises are nine separate associations-in-fact each consisting of one PBM Defendant and one Manufacturer Defendant, including those entities' directors, employees, and agents:

> A.   the Eli Lilly–CVS Caremark Enterprise;
>
> B.   the Eli Lilly–Express Scripts Enterprise;

Complaint- 145

C.      the Eli Lilly–OptumRx Enterprise (together with the Eli Lilly–CVS Caremark Enterprise and the Eli Lilly–Express Scripts Enterprise, the "Eli Lilly–PBM Defendant Enterprises");

D.      the Sanofi-Aventis–CVS Caremark Enterprise;

E.      the Sanofi-Aventis–Express Scripts Enterprise;

F.      the Sanofi-Aventis–OptumRx Enterprise (together with the Sanofi-Aventis–CVS Caremark Enterprise and the Sanofi-Aventis–Express Scripts Enterprise, the "Sanofi-Aventis–PBM Defendant Enterprises");

G.      the Novo Nordisk–CVS Caremark Enterprise;

H.      the Novo Nordisk–Express Scripts Enterprise; and

I.      the Novo Nordisk–OptumRx Enterprise (together with the Novo Nordisk–CVS Caremark Enterprise and the Novo Nordisk–Express Scripts Enterprise, the "Novo Nordisk–PBM Defendant Enterprises").

394.    These nine association-in-fact enterprises are collectively referred to herein as the "Manufacturer–PBM Enterprises."

395.    Each Manufacturer–PBM Enterprise is a separate, ongoing, and continuing business organization consisting of corporations and individuals associated for the common purpose of manufacturing, selling, and facilitating the purchase of the Manufacturer Defendants' products, including the at-issue drugs.

For example:

A.    Each of the three Eli Lilly–PBM Defendant enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Eli Lilly medications including Prozac, Cymbalta, and Zyprexa, as well as the at-issue Eli Lilly medications (Humulin N, Humulin R, Humulin R 500, Humulin 70/30, Humalog, Humalog Mix 50/50, Humalog Mix 75/25, and Basaglar), which are Eli Lilly's primary source of revenue.

B.    Each of the three Novo Nordisk–PBM Defendant enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Novo Nordisk medications for the treatment of obesity, hemophilia, and hormone imbalance, as well as the at-issue Novo Nordisk medications (Novolin R, Novolin N, Novolin 70/30, Novolog, Levemir, and Novolog Mix 70/30), which account for more than three-quarters of Novo Nordisk's revenue.

C.    Each of the three Sanofi–PBM Defendant enterprises associates for the common purpose of manufacturing, selling, distributing, and facilitating the purchase of Sanofi medications including Ambien, Plavix, and Dupixent, as well as the at-issue Sanofi medications (Lantus, Toujeo Solostar, and Apidra).

396.   Each Manufacturer–PBM Enterprise engaged in the shared purpose of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs to control the market for diabetes medications and profit from diabetics and payors, including Plaintiff.

397.   The members of each Manufacturer–PBM Enterprise are bound by contractual relationships, financial ties, and the ongoing coordination of activities.

398.   There also is a common communication network by which the members of each Manufacturer–PBM Enterprise share information and meet on a regular basis. These communications include, but are not limited to, communications relating to the use of false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from each Manufacturer Defendant to the PBM Defendants in exchange for formulary placement.

399.   Each Manufacturer–PBM Enterprise functions as a continuing but separate unit separate and apart from the pattern of racketeering activity in which it engages. Each Manufacturer–PBM Enterprise, for example, engages in the manufacture, distribution, and sale of medications and other products other than the at-issue insulin and insulin-analog medications. Additionally, each Manufacturer engages in conduct other than mail and wire fraud in furtherance of the Insulin Pricing Scheme.

400.   At all relevant times, each of the Manufacturer–PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and each PBM Defendant, namely, carrying out the Insulin Pricing Scheme.

401.   Each Manufacturer–PBM Enterprise derived secret profits from these activities that were greater than those any one of the Manufacturer Defendants or PBM Defendants could obtain absent their misrepresentations regarding their non-transparent pricing schemes.

402.   To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to each PBM Defendant in the form of Manufacturer Payments.

403.   Each Manufacturer–PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the false list prices.

404.   Each Manufacturer–PBM Enterprise's inflation of the list prices and secret Manufacturer Payments was a quid pro quo exchange for preferred formulary placement.

405.   Each Manufacturer–PBM Enterprise concealed from Plaintiff that these false prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions and

resulted in higher profits for each PBM Defendant, whose earnings increase the more inflated the price is and the more payment it receives from each Manufacturer Defendant.

406.   Each Manufacturer–PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including Plaintiff, and diabetics pay for diabetes medications.

407.   The Manufacturer Defendants would not be able to offer large pricing spreads to the PBM Defendants in exchange for favorable formulary positions without the use of the false list prices as the basis for the price paid by diabetics and payors, including Plaintiff, for the at-issue drugs.

408.   The PBM Defendants share this common purpose because nearly all the revenue and profit generated from the at-issue drugs is tied to the falsely inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors, including Plaintiff, paying for diabetes medications based on the inflated list prices, the PBM Defendants' profits from the Insulin Pricing Scheme would decrease.

409.   As a result, each PBM Defendant has, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (1) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that each

PBM Defendant retains to a large extent, including by relabeling these payments and utilizing rebate aggregators to avoid their pass-through obligations; (2) generating substantial profits from pharmacies because of the falsely inflated prices, including through retaining clawbacks and post-purchase discounts; (3) generating spread income by charging their clients a higher amount than they pay pharmacies, with the spread income increasing with each list price increase; and (4) generating profits on the diabetes medications sold through each PBM Defendant's own mail-order and retail pharmacies, including by keeping secret discounts each Manufacturer Defendant provides to these affiliated pharmacies.

410.   At all relevant times, each PBM Defendant and each Manufacturer Defendant has been aware of its respective Manufacturer–PBM Enterprise's conduct, has been a knowing and willing participant in and coordinator of that conduct, and has reaped profits from that conduct.

411.   Neither any PBM Defendant nor any Manufacturer Defendant alone could have accomplished the purposes of the Manufacturer–PBM Enterprises without the other entity.

## C.    The Enterprises Misrepresent and Fail to Disclose Material Facts in Furtherance of the Insulin Pricing Scheme.

412. Each Manufacturer–PBM Enterprise knowingly made material misrepresentations to the public and health plan payors, including Plaintiff, in

furtherance of the Insulin Pricing Scheme, including publishing artificially inflated prices for insulin on published indices and representing that:

A.     the false list prices for the at-issue diabetes medications were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price consumers and health plan payors, including Plaintiff, paid for these drugs;

B.     each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation;

C.     the Manufacturer Payments paid back to each PBM Defendant for each at-issue drug were for the benefit of health plan payors, including Plaintiff;

D.     all "rebates" and discounts negotiated by the PBM Defendants with the Manufacturer Defendants were remitted to health plan payors, including Plaintiff;

E.     the "rebates" negotiated by the members of each enterprise saved health plan payors, including Plaintiff, money;

F.     each Manufacturer Defendant and PBM Defendant were transparent with health plan payors, including Plaintiff, regarding the Manufacturer Payments, and that the PBMs did not retain any funds

associated with prescription drug rebates or the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies; and

       G.    each PBM Defendant constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of diabetics.

413.   Each false list price published by the Manufacturer Defendants constituted a material misrepresentation to consumers, health plan payors, and the public, in that each purported to be a fair market price for an at-issue drug, and each omitted to disclose the fraudulent spread between the list price and the net price of the medication or the basis therefor. Specific examples of such misrepresentations are set forth in the figures above. Examples of other specific affirmative representations by each Defendant in furtherance of each enterprise's Insulin Pricing scheme are set forth in paragraphs 197–98, 201–02, 209–210, 219–20, 223–24, 244–57 and 267.

414.   At all times relevant to this Complaint, each Manufacturer–PBM Enterprise knew the above-described representations to be false.

415.   At all times relevant to this Complaint, each Manufacturer–PBM Enterprise intentionally made these representations for the purpose of inducing consumers and health plan payors, including Plaintiff, into paying artificially inflated prices for diabetes medications.

416. Consumers and health plan payors, including Plaintiff, relied on the material misrepresentations and omissions made by each Manufacturer–PBM Enterprise in paying prices for the at-issue diabetes medications based upon the false prices generated by the Insulin Pricing Scheme.

417. Additionally, each PBM–Manufacturer Enterprise relied on the list prices negotiated and published by the other PBM–Manufacturer Enterprises in setting their own list prices and determining the value of the kickbacks paid to the PBMs. Health plan payors, including Plaintiff, were injured by the inflated prices that arose as a result.

418. Each PBM Defendant convinced health plan payors, including Plaintiff, to pay prices for the at-issue drugs based on the false list prices by using the misrepresentations listed above to convince the health plan payors, including Plaintiff, that they had secured lower prices when, in fact, they did the opposite, all while concealing the Insulin Pricing Scheme.

419. Without these misrepresentations and each Defendant's failure to disclose the Insulin Pricing Scheme, each Manufacturer–PBM Enterprise could not have achieved its common purpose, as consumers and health plan payors, including M-NCPPC, would not have been willing to pay these false list prices.

**D.     Defendants' Use of the U.S. Mail and Interstate Wire Facilities.**

420.   Each of the Manufacturer–PBM Enterprises engaged in and affected interstate commerce because each engaged in some or all of the following activities across state boundaries: the sale, purchase, and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; the transmission of pricing information of diabetes medications; the transmission and/or receipt of sales and marketing literature; the transmission of diabetes medications through mail-order and retail pharmacies; the transmission and/or receipt of invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the pricing of and payment for diabetes medications.

421. Each     Manufacturer–PBM     Enterprise     participated     in     the administration of diabetes medications to millions of individuals located throughout the United States, including in Maryland.

422.   The Manufacturer and PBM Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mail and interstate wire facilities.

Complaint- 155

423.    The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendant's and each PBM Defendant's corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mail and by interstate wire facilities with each other and with pharmacies, physicians, payors, and diabetics throughout Maryland.

424.    Each Manufacturer–PBM Enterprise's use of the U.S. mail and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

A.    marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent to each PBM Defendant located across the country, including throughout Maryland;

B.    written and oral representations of the false list prices of diabetes medications that each Manufacturer and PBM Defendant made at least annually and, in many cases, several times during a single year to the public;

C.    thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's diabetes medications on each PBM Defendant's formulary;

D.    written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each PBM

Defendant for each diabetes medication sold and/or to conceal these incentives or the Insulin Pricing Scheme;

E.    written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to each PBM Defendant to persuade it to advocate the at-issue diabetes medications;

F.    written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

G.    written and oral communications with payors, including Plaintiff, regarding the price of diabetes medications;

H.    written and oral communications to health plan payors, including Plaintiff, which included marketing and solicitation material sent by each PBM Defendant regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to each PBM Defendant for the diabetes medications described herein and the purpose of each PBM Defendant's formulary;

I.      transmission of published prices to third parties and payors, including Plaintiff;

J.      receipts of money on tens of thousands of occasions through the U.S. mail and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

425.    Although Plaintiff pleads the dates of certain communications in allegations incorporated into this Count, it cannot allege the precise dates of others without access to books and records within each Defendant's exclusive custody and control. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, and each of the Manufacturer Defendants and each PBM Defendant took deliberate steps to conceal its wrongdoing.

**E.      Conduct of the Manufacturer–PBM Enterprises' Affairs.**

426.    Each Manufacturer and PBM Defendant participates in the operation and management of Manufacturer–PBM Enterprises with which they are associated and, in violation of Section 1962(c) of RICO, conduct or participate in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation is carried out in the following ways:

A.      Each Manufacturer Defendant and each PBM Defendant directly negotiates and controls the secret Manufacturer Payments provided to each PBM Defendant for diabetes medications.

B.      Each PBM Defendant directly manages and controls their drug formularies and the placement of the at-issue diabetes medications on those formularies.

C.      Each PBM Defendant intentionally selects higher-priced diabetes medications for formulary placement and excludes lower priced ones to generate larger profits and coordinate with each Manufacturer Defendant to increase the availability and use of higher-priced medications because they are more profitable for both groups of Defendants.

D.      Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Insulin Pricing Scheme.

E.      Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales, and other materials used to inform each PBM Defendant of the profit potential from its diabetes medications.

F.      Each PBM Defendant directly controls the creation and distribution of marketing, sales, and other materials used to inform payors and the public of the benefits and cost-saving potential of their formulary and negotiations with the Manufacturers.

G.      Each PBM Defendant directs and controls each Manufacturer–PBM Enterprise's direct relationships with payors such as Plaintiff by

negotiating the terms of and executing the contracts that govern those relationships.

H.      Each PBM Defendant directs and controls each Manufacturer–PBM Enterprise's Insulin Pricing Scheme by hiding, obfuscating, and laundering Manufacturer Payments through their affiliated entities to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of payors, including Plaintiff.

I.      Each PBM Defendant distributes through the U.S. mail and interstate wire facilities, promotional and other materials that claim the Manufacturer Payments paid from each Manufacturer Defendant to each PBM Defendant save Plaintiff and other payors money on the at-issue drugs.

J.      Each Manufacturer Defendant represented to health plan payors, including Plaintiff—by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and each PBM Defendant —that the published prices of diabetes medications reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive fair market forces.

**F.    Defendants' Pattern of Racketeering Activity**

427.    The Manufacturer and PBM Defendants have conducted and participated in the affairs of their respective Manufacturer–PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

428.    The Manufacturer Defendants' and the PBM Defendants' pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail or interstate wire facilities in furtherance of the Insulin Pricing Scheme. Each of these mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in which the Manufacturer and PBM Defendants intended to defraud consumers and health plan payors, including Plaintiff.

429.    By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to each PBM Defendant and each PBM Defendant's formulary construction, and by subsequently failing to disclose such practices to consumers and health plan payors, the Manufacturer Defendants and the PBM

Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

430.   The Manufacturer and PBM Defendants' racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive payors, including Plaintiff.

431.   Each separate use of the U.S. mail and/or interstate wire facilities employed by the Manufacturer Defendants and the PBM Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

432.   The Manufacturer Defendants and the PBM Defendants engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer–PBM Enterprises with which each of them is and was associated in fact.

## G.    The RICO Defendants' Motive

433.   The Manufacturer and PBM Defendants' motive in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer–PBM Enterprises described herein was to control the market for diabetes medications and falsely obtain sales of and profits from diabetes medications.

434.   The Insulin Pricing Scheme was designed to, and did, encourage others, including payors such as Plaintiff, to advocate the use of each Manufacturer Defendant's products and to pay for those diabetes medications based on a falsely inflated price. Each Manufacturer Defendant used the Insulin Pricing Scheme to obtain formulary placement to sell more of its drugs without cutting into its profits. The PBM Defendants used the Insulin Pricing Scheme to falsely inflate the price payors such as Plaintiff paid for diabetes medications to profit from the Insulin Pricing Scheme, as discussed above.

## H.    The Manufacturer–PBM Enterprises' Insulin Pricing Scheme Injured the Maryland-National Capital Park and Planning Commission.

435.   Each Manufacturer–PBM Enterprise's violations of federal law and pattern of racketeering activity have directly and proximately caused Plaintiff to be injured in its business or property.

436.   The prices Plaintiff pays for the at-issue drugs are tied directly to the false list prices generated by the Insulin Pricing Scheme.

437.   No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based, other than the Manufacturer–PBM Defendant Enterprises.

438.   Defendants collectively set the prices Plaintiff paid for the at-issue drugs.

439.   During the relevant period, Defendant CVS Caremark provided PBM services to Plaintiff and benefited therefrom.

440.   During the relevant period, Plaintiff paid Defendant CVS Caremark directly for the at-issue drugs.

441.   Each Manufacturer–PBM Enterprise controlled and participated in the Insulin Pricing Scheme that was directly responsible for the false list prices upon which the price Plaintiff paid was based.

442.   Plaintiff thus was damaged by the scheme. But for the illegal conduct of the Manufacturing–PBM Enterprises, including the misrepresentations and false prices created by the Insulin Pricing Scheme that each Manufacturer–PBM Enterprise employed, the Park and Planning Commission would have paid less for the medications.

443.   While Defendants' scheme injured an enormous number of payors and plan members, Plaintiff's damages are separate and distinct from those of any other victim harmed by the Manufacturer–PBM Enterprises' Insulin Pricing Scheme.

444.   By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to Plaintiff for three times the damages that were sustained, plus the costs of bringing this action, including reasonable attorneys' fees.

445.  By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, Plaintiff seeks injunctive relief against the Manufacturer and PBM Defendants for their fraudulent reporting of prices, and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

446.  Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. M-NCPPC continues to purchase the at-issue diabetes medications, and will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff seeks injunctive relief, including an injunction against the Manufacturer Defendants and the PBM Defendants, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

### COUNT TWO — VIOLATIONS OF RICO, 18 U.S.C. § 1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c) (Against All Defendants)

447.  Plaintiff incorporates by reference all preceding paragraphs up to Section V, as well as Count I, of this Complaint as though fully set forth herein.

448.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

449.   Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

450.   As set forth in detail above, as well as in the Civil Conspiracy count below, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme, and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants, and the PBMs' formulary construction; and the PBM Defendants agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement.

451.   The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C.

§ 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

452.  Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

    A.  multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

    B.  multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

    C.  multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

453.  Defendants' conspiracy to violate the above federal laws and the effects of that conspiracy detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

454.  By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this action, including reasonable attorneys' fees.

## COUNT THREE — CIVIL CONSPIRACY
### (Against All Defendants)

455.   Plaintiff incorporates by reference all preceding paragraphs up to Section V, as well as Counts I, II, and VI, of this Complaint as though fully set forth herein.

456.   Defendants' conduct described throughout this Complaint as comprising and implementing the Insulin Pricing Scheme constituted a combination of two or more persons created and carried out for an unlawful purpose or a lawful purpose by unlawful means, further to which one or all Defendants committed an overt tortious or unlawful act.

457.   Each and every Defendant knowingly and maliciously participated in the creation and implementation of the Insulin Pricing Scheme.

458.   Each and every Defendant planned, assisted, and encouraged the Insulin Pricing Scheme.

459.   Defendants aided and abetted one another to violate federal laws, including 18 U.S.C. § 1962(c) and the Maryland Consumer Protection Act, as alleged herein.

460.   Each Defendant agreed to carry out and carried out overt acts in furtherance of the Insulin Pricing Scheme that artificially inflated the price of diabetes medications to Plaintiff's detriment.

461.    Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

462.    The Manufacturer Defendants agreed with each other and the PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to the PBM Defendants.

463.    In exchange for the Manufacturer Defendants inflating their prices and making large secret payments, the PBM Defendants agreed to and did grant preferred formulary status to the Manufacturer Defendants' diabetes medications.

464.    Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither the PBM Defendants nor the Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

465.    The PBM Defendants need the Manufacturer Defendants to inflate the list price of their diabetes medications and to make secret payments back to the PBM Defendants in order for the PBM Defendants to profit off the Insulin Pricing Scheme.

466.    The Manufacturer Defendants need the PBM Defendants to grant certain diabetes medications preferred formulary placement in order to maintain access to payors and diabetics whose purchase of the at-issue drugs generated unearned and unwarranted revenue for all Defendants.

467.   As discussed throughout this Complaint, the Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication, and exchange of information between the PBM Defendants and the Manufacturer Defendants.

468.   In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that infers Defendants conspired to engage in fraudulent conduct:

A.   Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order to maintain the secrecy of the Insulin Pricing Scheme;

B.   Numerous ongoing government investigations, hearings, and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

i.   civil investigative demands to the Manufacturer Defendants from the States of California, Florida, Minnesota, and Washington, relating to the pricing of their insulin products and their relationships with the PBM Defendants;

ii.   letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade

Commission asking them to investigate potential collusion among Defendants;

iii.    2019 hearings before the House Oversight and Reform Committee on industry practices; and

iv.    the Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs, resulting in the Grassley-Wyden Senate Report, first published in 2021.

C.    The astronomical rise in the price of the at-issue drugs coincides with the PBM Defendants' rise in power within the pharmaceutical pricing system starting in 2003.

469.    As a result of Defendants' unlawful and tortious acts, including violations of 18 U.S.C. § 1962(c) and the Maryland Consumer Protection Act, Plaintiff has suffered actual damage and continues to be damaged by the conspiracy when it overpays for diabetes medications.

## COUNT FOUR — COMMON LAW FRAUD
### (Against Defendants CVS Caremark, Zinc Health Services, Eli Lilly, Sanofi-Aventis, and Novo Nordisk)

470.    Plaintiff incorporates by reference all preceding paragraphs up to Section V, as well as Counts I – III, of this Complaint as though fully set forth herein.

471.  As alleged extensively above, these Defendants affirmatively misrepresented and/or concealed and suppressed material facts concerning: (a) the true cost and/or price of the insulin products described herein; (b) the inflated and/or fraudulent nature of the list price(s) set and/or charged by these Defendants for the insulin products described herein; (c) the existence, amount, and/or purpose(s) of discounts and/or rebates offered and/or negotiated by these Defendants for those products; and (d) the role that these Defendants played in the price paid for the insulin products described herein, including but not limited to marketing material averring that these Defendants decrease the price of prescription drugs for consumers.

472.  Defendants CVS Caremark, Zinc Health Services, Eli Lilly, Sanofi-Aventis, and Novo Nordisk valued their profits over the trust, health, and safety of Plaintiff.

473.  Necessarily, these Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to Plaintiff.

474.  These Defendants' false representations and omissions were material to Plaintiff.

475.  These Defendants knew that their representations and omissions were false and misleading. They knew, for example, that the list prices for the at-issue

drugs were inflated and disconnected from market price. They knew that these list prices were artificially inflated to fund kickbacks to the PBM Defendants in exchange for preferred formulary placement.

476.    Defendants intentionally acted with ill will, evil motive, or actual malice by continuously making false representations and omissions to Plaintiff and the general public about the pricing of insulin products and the amount of rebates and other fees paid by the Manufacturer Defendants to the PBM Defendants for these products. Defendants intentionally acted with ill will, evil motive, or actual malice in falsely representing to Plaintiff that all negotiated manufacturer rebates would be passed through to Plaintiff, despite knowing that the proportion of rebates passed through represents only a fraction of the total rebate dollars received. Defendants knew that their representations to Plaintiff were false and misleading as they did not disclose, *inter alia*, the relabeling of "rebates" and the use of rebate aggregators to avoid their rebate pass-through obligations, and Defendants knew and intended that Plaintiff would overpay for the at-issue insulin medications as a result of these false representations and omissions.

477.    Plaintiff reasonably relied on these Defendants' deception, and these Defendants intended that they would so rely. Plaintiff had no way of discerning that these Defendants were, in fact, deceiving them because these Defendants possessed exclusive knowledge regarding the nature of insulin pricing; intentionally concealed

the foregoing from Plaintiff and the public; and made incomplete or negligent representations about the pricing of insulin products and these Defendants' role in that pricing, while purposefully withholding material facts from Plaintiff that contradicted these representations.

478.   Plaintiff relied on these Defendants' false list prices. Because of the Insulin Pricing Scheme, list prices have skyrocketed and the spread between list price and net price has ballooned. Plaintiff is injured by this list and net price divergence. Through the scheme, these Defendants have forced payors, including Plaintiff, to pay not just for the drugs, but also for undisclosed kickbacks that are paid to PBMs.

479.   These Defendants took steps to ensure that their employees and co-conspirators did not reveal the details of the Insulin Pricing Scheme to Plaintiff.

480.   These Defendants owed Plaintiff a duty to disclose, truthfully, all facts concerning the true cost of the at-issue medications and the inflated and fraudulent nature of their pricing; the existence, amount, flow, and purpose of rebates and discounts negotiated for those products; and the role that these Defendants played in increasing the price of the at-issue drugs.

481.   These Defendants possessed superior knowledge of essential facts about the at-issue drugs and their prices. That information was peculiarly and exclusively in their control and not available to payors, including Plaintiff. In light

of their misleading or incomplete representations, these Defendants also had an obligation to disclose facts related to the Insulin Pricing Scheme.

482.   These Defendants' actions, representations, and misrepresentations demonstrate callous disregard for not only the rule of law but also public health. Indeed, as a direct result of these Defendants' actions, access to live-saving insulin medication has been limited, denied, or forgone.

483.   These Defendants owed Plaintiff a duty to disclose, truthfully, all the facts concerning the true cost of the at-issue medications described herein and the inflated and fraudulent nature of their pricing; the existence, amount, and purpose of rebates and discounts negotiated for those products; and the role that these Defendants played in increasing the price of the at-issue medications described herein.

484.   These Defendants hatched their deceptive schemes and knew that Plaintiff was unaware of (and could not reasonably discover) the manner in which they sought to artificially inflate the price of the insulin medications. These Defendants not only concealed all the facts concerning the true cost of the insulin products described herein, but went further in marketing materials and other communications, to make affirmative misrepresentations that these Defendants worked to lower the ultimate cost of prescription medications. These Defendants engaged in this fraudulent concealment at the expense of Plaintiff.

Complaint- 175

485.    Plaintiff was not aware of the concealed and misrepresented material facts referenced above, and it would not have acted as it did, had it known the truth.

486.    As a direct and proximate result of these Defendants' fraudulent scheme, Plaintiff sustained damages, including but not limited to paying excessive and inflated prices for the insulin products described herein.

487.    These Defendants are liable to Plaintiff for damages in an amount to be proven at trial. Moreover, because these Defendants acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiff for the purpose of enriching themselves to Plaintiff's detriment, these Defendants' conduct warrants substantial damages in an amount to be determined at trial.

## COUNT FIVE — UNJUST ENRICHMENT
### (Against Defendants CVS Caremark, Zinc Health Services, Eli Lilly, Sanofi-Aventis, and Novo Nordisk)

488.    Plaintiff incorporates by reference all preceding paragraphs up to Section V, as well as Counts I – IV, of this Complaint as though fully set forth herein.

489.    Plaintiff brings this Count on behalf of itself.

490.    This claim is alleged in the alternative to Plaintiff's claims for legal relief.

491. Defendants have knowingly benefitted from the Insulin Pricing Scheme described herein, including selling, setting prices for, and negotiating discounts for insulin products marketed and sold at an artificially inflated price.

492. Defendants have knowingly received and retained unjust benefits from Plaintiff as a result of the Insulin Pricing Scheme described herein, including in the form of gross prescription costs paid, copayments, and coinsurance payments, and inequity has resulted.

493. It is inequitable and unconscionable for Defendants to retain these benefits.

494. Because Defendants concealed the true nature of the payments they received and the amounts they purportedly pass through to M-NCPPC, the Park and Planning Commission was not aware of the true facts concerning the Insulin Pricing Scheme described herein and did not benefit from Defendants' misconduct.

495. Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

496. Equity cannot in good conscience permit Defendants to be economically enriched for their unjust actions at Plaintiff's expense and in violation of state law, and therefore restitution or disgorgement or both of such economic enrichment is required.

## COUNT SIX — MARYLAND CONSUMER PROTECTION ACT, MARYLAND COMMERCIAL LAW CODE SECTION 13-301 *ET SEQ.*
### (Against Defendants CVS Caremark and Zinc Health Services)

497.  Plaintiff incorporates by reference all preceding paragraphs up to Section V, as well as Counts I–V, of this Complaint as though fully set forth herein.

498.  The Maryland Consumer Protection Act ("CPA") broadly prohibits any business from engaging in "any unfair or deceptive trade practice," in the sale or offer for sale of any consumer goods. Md. Code Ann., Com. Law § 13-303(1). Unfair, abusive, or deceptive trade practices include, *inter alia*, any:

A.    "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" Md. Code Ann., Com. Law § 13-301(1);

B.    "[r]epresentation that consumer goods . . . have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;" Md. Code Ann., Com. Law § 13-301(2)(i);

C.    "[f]ailure to state a material fact if the failure deceives or tends to deceive;" Md. Code Ann., Com. Law § 13-301(3); and

D.    "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection

with . . . [t]he promotion or sale of any consumer goods[.]" Md. Code Ann., Com. Law § 13-301(9)(i).

499.    Defendants are "persons" as defined by Md. Code Ann., Com. Law § 13-101(h).

500.    Plaintiff is a "person" and a "consumer" as defined by Md. Code Ann., Com. Law §§13-101(c), (h).

501.    Defendants committed the acts complained of herein in the course of the "sale" or "offer for sale" of "consumer goods" and "consumer services" as defined by Md. Code Ann., Com. Law § 13-303(1) and 13-303(2).

502.    Insulin is a "consumer good" under the CPA as defined by Md. Code Ann., Com. Law § 13-101(d)(1).

503.    By carrying out the Insulin Pricing Scheme, Defendants' conduct constitutes unfair and deceptive practices as defined by Md. Code Ann., Com. Law §§ 13-301(1), (2), (3), and (9). Defendants thus violated the Maryland CPA, at a minimum by taking the following actions:

A.    Making material misrepresentations regarding the true cost of the insulin products described herein that had the tendency to mislead consumers and health plan payors, such as Plaintiff, including, but not limited to, by publishing, setting, or distributing the list price of the insulin products described herein;

B.      Engaging in advertising concerning the roles that Defendants CVS Caremark and Zinc Health Services played in setting the price paid for the insulin products described herein, including but not limited to marketing material averring that Defendant CVS Caremark makes efforts to decrease the price of prescription drugs for consumers;

C.      Using the inflated list prices to determine the prices paid by health plan payors, including Plaintiff, and failing to disclose the inflated nature of the list price(s) set and/or charged by Manufacturer Defendants for the insulin products described herein, with the knowledge, consent, and cooperation of Defendants CVS Caremark and Zinc Health Services;

D.      Making material misrepresentations regarding or failing to disclose the existence, amount, and/or purpose(s) of discounts, rebates, and/or other payments offered by the Manufacturer Defendants to Defendants CVS Caremark and Zinc Health Services and/or negotiated by Defendants CVS Caremark and Zinc Health Services in exchange for inclusion and/or tier placement of the Manufacturer Defendants' products on Defendant CVS Caremark's formularies;

E.      Making material misrepresentations regarding or failing to disclose the portion of discounts, rebates, and/or other payments from the

Manufacturer Defendants that Defendants CVS Caremark and Zinc Health Services keep;

F.     Misleading health plan payors, including Plaintiff, as to the true nature of the value of the services provided and reaping illicit profits exponentially greater than the fair market value of the products and services provided;

G.     Confusing and misleading health plan payors, including Plaintiff, regarding Defendants CVS Caremark's and Zinc Health Services' role in the Insulin Pricing Scheme in an attempt to evade liability;

H.     Hiding, obfuscating, and laundering the Manufacturer Payments through Defendant CVS Caremark's affiliated entities in order to retain a large and undisclosed proportion of the Manufacturer Payments to the detriment of health plan payors, including Plaintiff; and/or

I.     Engaging in misleading, false, unfair and/or deceptive acts or practices by selling and/or facilitating the sale of the insulin products described herein at grossly inflated and/or fraudulently obtained price points.

504.  Defendants CVS Caremark and Zinc Health Services continue to make misrepresentations and publish false prices generated by the Insulin Pricing Scheme, and consumers and health plan payors, including Plaintiff, continue to purchase diabetes medications at inflated prices, notwithstanding the Manufacturer

Defendants' price caps. The foregoing violations caused harm to Plaintiff, and are likely to harm Plaintiff in the future if Defendants CVS Caremark's and Zinc Health Services' practices are not stopped.

505. Each at-issue purchase Plaintiff made of diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the Maryland Consumer Protection Act.

506. These Defendants' acts and practices in violation of the Maryland Consumer Protection Act caused Plaintiff to suffer injuries alleged herein, including but not limited to paying excessive and inflated prices for diabetes medications as described herein.

507. Defendants are liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and any other remedies the Court may deem appropriate under Md. Code Ann., Com. Law §13-408.

## I.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment against the Defendants for all the relief requested herein and to which the Plaintiff may otherwise be entitled, specifically including, but without limitation, to wit:

A.    A determination that Defendants have violated RICO, conspired to violate RICO, engaged in a civil conspiracy, and have been unjustly enriched;

B.    A determination that Defendants CVS Caremark and Zinc Health Services have violated the Maryland Consumer Protection Act;

C.    Judgment in favor of Plaintiff and against the Defendants for damages in excess of the minimum jurisdictional requirements of this Court, in a specific amount to be proven at trial;

D.    Injunctive relief in accordance with the Maryland Consumer Protection Act (Md. Code Ann., Com. Law § 13–101 et seq.), 18 U.S.C. § 1964(a) and 18 U.S.C. § 1962(c), to the effect that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein in violation of RICO, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.    That Plaintiff:

1.    be awarded restitution, damages (including but not limited to treble damages as permitted by 18 U.S.C. §§ 1962(c) and 1964(a)), punitive or exemplary damages sufficient to punish Defendants' ill will, evil motive,

or actual malice, disgorgement, penalties, and all other legal and equitable relief to which Plaintiff may be entitled;

2.     be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

3.     recover its costs of this action, including its reasonable attorneys' fees; and

4.     be awarded such other further relief as the case may require and the Court may deem just and proper under the circumstances.

## II.     JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

**RESPECTFULLY SUBMITTED** this 13th day of January, 2025.

                    **KELLER ROHRBACK L.L.P.**

                    By: *s/ David J. Ko*
                    Derek W. Loeser, WSBA #24274
                    David J. Ko, WSBA #38299
                    Juli E. Farris, WSBA #17593
                    Laura R. Gerber, WSBA #34981
                    Matthew M. Gerend, WSBA #43276
                    Rachel C. Bowanko, WSBA #61298
                    Andrew N. Lindsay, WSBA #60386
                    1201 Third Avenue, Suite 3400
                    Seattle, Washington 98101
                    Telephone: (206) 428-0563

Complaint- 184

dloeser@kellerrohrback.com
dko@kellerrohrback.com
jfarris@kellerrohrback.com
lgerber@kellerrohrback.com
mgerend@kellerrohrback.com
rbowanko@kellerrohrback.com
alindsay@kellerrohrback.com

***Attorneys for Plaintiff***